[Cite as *In re T.J.*, 2021-Ohio-4085.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

In re T.J.                                   Court of Appeals Nos.  E-21-007
In re J.C.                                                         E-21-008

                                             Trial Court Nos.  2017 JN 011
                                                               2017 JN 012


                              **DECISION AND JUDGMENT**

                              Decided:  November 17, 2021

                              * * * * *

Kevin J. Baxter, Erie County Prosecuting Attorney, and
Kristin Palmer, Assistant Prosecuting Attorney, for appellee.

Linda M. Fritz-Gasteier, for appellant.

                              * * * * *

**MAYLE, J.**

                        **I.  Introduction**

{¶ 1} In this consolidated appeal, P.E., the mother and appellant herein, appeals

two final judgments of the Erie County Court of Common Pleas, Juvenile Division that

terminated her parental rights and granted permanent custody of her children, T.J. and

J.C., to the Erie County Department of Job and Family Services ("JFS"), the appellee herein. For the following reasons, we affirm.

## II. Background

### A. The Family's Involvement with JFS

{¶ 2} The children at issue in this case are J.C. (d.o.b. 6/29/2010) and her half-brother, T.J. (d.o.b. 8/11/2014). Mother has two older children who are full-blooded siblings to J.C. They are in the legal custody of their paternal grandparents.

{¶ 3} JFS became involved with this family after T.J.'s father, R.J., was arrested and jailed on weapons charges in late 2016. In the months that followed, JFS learned that mother, who was dating R.J., was suspected of selling cocaine out of the couple's Sandusky, Ohio home. JFS also cited concerns about the overall condition of the home and that the children were not being cared for.

{¶ 4} On January 18, 2017, JFS investigator Emeline Clyburn visited the home, accompanied by the police. Mother allowed the authorities to come inside and to search the home. Following a search, the police confiscated cocaine, a digital scale, and plastic baggies from a safe inside the house. Mother was not arrested because "[t]here was no indication that [she] was involved." Mother's drug screen was also clear.

{¶ 5} In early February, JFS was shown a disturbing video, posted on social media, that showed a "visibly distraught" T.J. trying to wake up mother, who appeared to be intoxicated. In another scene, the video shows mother attempting to perform sex acts

2.

on R.J. (before his arrest) in the presence of T.J.  The video raised "additional concerns" that the children were "in danger."

## B.  JFS files a complaint, and a case plan is developed.

{¶ 6} Based upon "the history of the family, the concerns for past drug sales out of the home and the video that was streamed," JFS filed a complaint on February 10, 2017, claiming that J.C. and T.J. were neglected and dependent.  By motion, JFS also requested emergency temporary custody of the children, which was granted.

{¶ 7} An adjudicatory hearing was held on March 17, 2017.  The purpose of an adjudicatory hearing is "to determine whether a child is * * * abused, neglected, or dependent or is otherwise within the jurisdiction of the court."  Juv.R. 2(B).  At the hearing, the agency withdrew its claims of neglect, and mother and R.J. consented to a finding of dependency as to T.J.  Mother also consented to a finding of dependency with respect to J.C.  J.C.'s father, Jo.C., did not appear at the hearing and "had nothing to do with the agency" or these proceedings.

{¶ 8} Initially, R.J. was included in the case plan but was removed after he was sentenced and began serving an eight-year prison sentence with regard to his criminal case.  R.J. was represented by counsel throughout the trial phase.  He did not appeal the final judgment in this case and has not participated in these proceedings.

{¶ 9} Mother's original case plan ordered her to attend a parenting course and to complete assessments for substance abuse and mental health.  Even after mother

3.

completed the parenting course, it "[remained] on the case plan" so that mother could "continue applying" the skills she was taught there. Mother successfully completed case planning services for substance abuse, and that requirement was removed from her case plan.

{¶ 10} At the time of the original case plan, mother was working and had "stable housing." But, by June of 2017, mother was "either homeless or would jump jobs." Accordingly, mother's case plan was amended to include housing and employment for six consecutive months. According to JFS, mother needed to be able to provide "stable and safe housing" and "to be able to take care of the kids' basic needs."

{¶ 11} Mother's case plan was amended again to add a mental health assessment with a parenting component, and to follow all recommendations of the assessor, including that mother attend individual counseling sessions "at least" every month.

### C. JFS moves for permanent custody, and a trial is held.

{¶ 12} On January 2, 2019, JFS filed motions for permanent custody of J.C. and T.J. With regard to mother's case plan, JFS claimed that mother had not successfully completed her case plan goals. Specifically, it alleged that mother failed to provide a safe, sanitary and stable home for at least six months, failed to make sufficient progress in her parenting style, and was inconsistent in attending her mental health counseling.

{¶ 13} A trial was held before a magistrate on October 10, 2019. In all, eight witnesses testified: JFS investigator Emeline Clyburn, the three ongoing caseworkers

4.

who were assigned to the case over its 22-month duration (Chelsey Billman, Jodi Moen, and Brooke Molnar), Guardian Ad Litem Lori Brobst, mother, and two witnesses who testified on mother's behalf: Deanna Wallace and Angela Hopkins.

## The Caseworkers

{¶ 14} Chelsey Billman served as the first case manager and observed several visits between mother and the children. According to Billman, although mother successfully completed her parenting course "early," she failed to apply the skills that she was taught there. For example, despite receiving instruction about nutrition, mother "continued to * * * provide [un]healthy foods," during visits that upset T.J.'s stomach and caused "really bad diarrhea." During one visit, mother allowed T.J. to consume "an entire jar of mayonnaise." Billman also observed that "[t]here was no redirection" by mother during visits when the children displayed negative behaviors.

{¶ 15} Billman, who later became a foster care licensing specialist, also testified that no one completed the application paperwork to serve as a custodian of the children. Similarly, no one filed, independently, for legal custody of the children.

{¶ 16} The second case manager, Jodi Moen, oversaw the case from June of 2017 until September of 2018, and for three months in the summer of 2019. Soon after getting the case, Moen received a call from mother that she was living with her own mother (hereinafter "grandmother"). Mother instructed Moen "not to come to [grandmother's] house to find her [because] [grandmother] did not want her there." When Moen

5.

attempted a "face-to-face" there, grandmother "came to the door [and] said that [mother] did not live there." Moen was told that no one knew mother's "exact address." Later, mother called and was "very upset with [Moen]" for attempting to visit and insisted that she did, in fact, live with grandmother. Moen advised that she "needed to be able to see [mother] each month," even if she was not allowed inside.

{¶ 17} Under Moen's supervision, mother's case plan was amended to require that she obtain employment and housing for a period of six consecutive months. According to Moen, mother was homeless "during the entire time" she served as case manager. While mother said, on more than once occasion, that she was "getting [a] house," none was ever "able to be lived in," either because it was "condemned" or it was "not habitable."

{¶ 18} Brooke Molnar took over as case manager in September of 2018. "Shortly [there]after," mother was able to secure a rental home, where she lived until July of 2019. According to Molnar, the home "was probably suitable" for the children, and mother granted the agency access to it "at times." But, home visits were suspended when mother allowed a vicious dog to live there that "viciously attacked" mother's older son. Mother waited "about a month" before she allowed the dog warden to remove the dog. When mother began to "struggle" to make rent on the home, Molnar advised her that she could apply for rental assistance if she secured employment. Mother declined the offer, saying that she had "figured it out." In July of 2019, mother was evicted, which JFS learned

6.

after-the-fact.  Because a home visit was never conducted in this case, [JFS] was not able to "determine [whether mother had] a safe home for the kids to go to."  As of the trial date, JFS did not know where mother was living.

{¶ 19} According to Molnar, mother had "more jobs than [Molnar could] count," but probably "around ten."  But, JFS was only able to verify that mother was actually employed by one, McDonalds, which ended in February of 2019.  Under cross examination, Molnar conceded that mother had been employed by McDonalds for over six months, in compliance with the case plan, but that her employment and the time she had suitable housing "weren't concurrent."

{¶ 20} Molnar described mother as "fairly cooperative," in that she was "never * * * mean," but she did "lie[]," which impacted the children.  For example, while T.J. was awaiting surgery to have a kidney removed in a Cleveland hospital, mother told the hospital staff that he had recently had a high fever, which—although not true—caused the surgery to be rescheduled and T.J. sent home.  Mother also reported to Molnar that she "had some heart attacks" and suffered from severe asthma and cancer, but failed to provide any medical information to the agency.

{¶ 21} Molnar testified that mother's failure to obtain "safe and stable housing," her inability to support her children, and her alleged health conditions all posed barriers to her reunification with her children.  Molnar also testified that J.C. and T.J. were currently in need of a legally secure placement and that awarding JFS permanent custody

7.

was the least restrictive option that would facilitate adoption of both children.  In her professional opinion, the children should be committed to the permanent custody of JFS.

### The Guardian Ad Litem

{¶ 22} Throughout the course of the case, the GAL observed three or four visits between mother and the children, observed the children in their foster home, reviewed all pertinent records, including court, medical and visitation records, and made inquiries into mother's case management progress.  The GAL authored two reports, dated July 8, 2019 and October 10, 2019, and both were admitted at trial.

{¶ 23} The GAL described T.J., aged five, as follows:  "[T.J.] enjoys the [visitation] time with his mother, but is mostly defiant, has tantrums, and has little ability to negotiate.  He also has a fear of dogs.  Mother maintains aggressive breeds of dogs, one of which attacked a child."  The GAL described J.C., aged nine, as "a pretty sharp kid," who "suffers the traumatic effects of failed parenting."  She added that, while J.C. "has the love and affection of her mother, [she] yearns for consistent parenting."  The GAL described the children as doing "extremely well" in their current placement, that they are "educationally on target or advanced," and that they have "good routines."

{¶ 24} The GAL opined that mother had not made sufficient progress in her case plan to enable her to care for her children independently.  The GAL observed that "mother struggles to effectively control [T.J.'s] behavioral outbursts," by "ignor[ing] aberrant behaviors, fail[ing] to follow through with sanctions, or simply laugh[ing]-off

8.

behaviors." The GAL further observed that "[older sister, J.C.,] spends a lot of time at visits helping her mother control and parent [T.J.] [which] is not appropriate." Recalling mother's "disturbing * * * conduct" that delayed her son's surgery, the GAL testified that mother failed to "be honest with [the] people who [were there to] help [her]."

{¶ 25} According to the GAL, mother reported that she "had some cardiac issues or something" which caused her to "lose her job." Mother provided the GAL with a report from her osteopath, which indicated that mother was "ill and unable to work for * * * just a couple of days." Mother provided no further information regarding her health status or any work limitations.

{¶ 26} Since the GAL's appointment in mid-2018, she was never able to visit with mother in a home belonging to mother. One month before trial, the GAL contacted mother to say, "we need to see your place," but mother failed to "advise[] * * * where she was living [or whether the GAL] could come there."

{¶ 27} The GAL recommended that the children be placed in the permanent custody of JFS because, although mother "tried really hard to work the case plan," she failed to make "sufficient progress" and the potential to give the children a stable and loving home outweighed the harm of the parent/child relationship.

**Mother**

{¶ 28} Mother testified that it would not be in the children's best interest if her parental rights were terminated. Like other witnesses, mother described a "very loving

and [caring] * * * bond," between herself and all four of her children, but she added that her older son could no longer attend visits with T.J. and J.C. because he is on "house arrest" due to "his current charges."

{¶ 29} Mother admitted that, between July and October of 2019, she did not receive any mental health services, despite the case planning requirement that she receive treatment on a monthly basis. Mother blamed a lack of transportation and "playing phone tag" with her counselor. With regard to her physical health, mother claimed that she has "problems with [her] heart," resulting in chest pain and difficulty breathing and may also have "ovarian cancer," although it has not been "fully diagnosed * * * yet." Mother denied that either condition would interfere with her ability to parent.

{¶ 30} Mother admitted that she told T.J.'s surgeon that he had "felt warm" during a visit earlier in the week and that he had a "crust[y]" nose.

{¶ 31} With regard to housing, mother admitted that she prevented the agency from entering grandmother's home, and she understood that JFS could not approve a residence without seeing it. Mother claimed to have lived independently in a rental home for nine months and was told by JFS that it was "looking good," before she was evicted in July of 2019. Finally, mother testified that she anticipated "having housing * * * soon," and that she had been working at a bakery for "about a month." Based upon her current employment and expected housing, mother felt that she could meet the needs of

10.

her children. She also testified that she would continue to make all medical and counseling appointments for herself and her children.

## Mother's witnesses

{¶ 32} Mother called two witnesses to testify on her behalf. The first was her cousin Deanna Wallace, who testified that she last observed mother and children in 2017 and that they had a "great bond."

{¶ 33} Mother's long-time friend, Angela Hopkins, also testified. Hopkins helped to raise J.C. from the time she was two months old. According to Hopkins, J.C. lived "primarily" with her during the week because mother "struggled sometimes" and was not "too sure about the infancy stage." Later, J.C. "resided with [Hopkins] for the whole two and a half years" that mother was dating R.J. When asked why she never filed for legal custody of either child, Hopkins testified,

> I didn't feel it was necessary. I didn't. [Mother] * * * didn't want to sign over custody because eventually she wanted [J.C.] back home full time. But [J.C.] had been with me for so long * * *. [J.C.] was more comfortable with me because she had our full attention because she was the only child in the house.

{¶ 34} After the children were removed from mother, Hopkins called JFS frequently and visited the agency twice, but she was never was able to speak to anyone "regarding placement." Hopkins did not complete any paperwork, but claimed to have a

11.

lawyer and was "in the process" of filing for custody, separate from the termination proceeding.

### D. The court grants JFS's motions.

{¶ 35} On October 24, 2019, the magistrate issued decisions recommending that mother and fathers' parental rights be terminated and that permanent custody of J.C. and T.J. be awarded to JFS. Mother filed timely objections. By judgment entries dated March 2, 2021, the juvenile court overruled the objections and adopted the decisions. Mother appealed and raises two assignments of error for our review:

I.  trial court erred in granting the Erie County Department of Job and Family Services' motion for permanent custody and terminating the parental rights of appellant as the agency failed to show by clear and convincing evidence that said decision was in the best interest of the minor children and said decision was against the manifest weight of the evidence.

II.  The trial court erred in granting the Erie County Department of Job and Family Services' motion for permanent custody and terminating the parental rights of appellant as the agency failed to show by clear and convincing evidence that appellant had not substantially complied with her caseplan and said decision was against the manifest weight of the evidence.

12.

### III. Law and Analysis

### A. The statutory framework

{¶ 36} R.C. 2151.414 sets forth "specific findings a juvenile court must make before granting an agency's motion for permanent custody of a child." *In re A.M.,* Slip Opinion No. 2020-Ohio-5102, ¶ 18 citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 22. As relevant here, the court must find by clear and convincing evidence "(1) that one or more of the conditions in R.C. 2151.414(B)(1)(a) through (e) applies and (2) that a grant of permanent custody is in the child's best interest. R.C. 2151.414(B)(1)." *Id.* All of the court's findings under R.C. 2151.414 must be by clear and convincing evidence. "Clear and convincing evidence" is evidence sufficient for the trier of fact to form a firm conviction or belief that the essential statutory elements for a termination of parental rights have been established. *Cross v. Ledford,* 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *In re Tashayla S.*, 6th Dist. Lucas No. L-03-1253, 2004-Ohio-896, ¶ 14.

{¶ 37} In this case, the trial court found—as to the first requirement—that R.C. 2151.414(B)(1)(a) and (d) applied, i.e. that the children cannot and should not be placed with either of the parents within a reasonable time *and* that the children have been in the temporary custody of JFS for 12 or more months of a consecutive 22 month period. On appeal, mother "concedes" that the first requirement of the statute is satisfied because the children have been in the temporary custody of JFS for 12 or more months of a

13.

consecutive 22 month period under R.C. 2151.414(B)(1)(d). Mother limits her challenge to the juvenile court's finding that a grant of permanent custody to JFS was in the children's best interest. Accordingly, we confine our decision to that issue. *Accord In re A.M.* at ¶ 18.

{¶ 38} An agency that seeks permanent custody of a child bears the burden of proving that the grant of permanent custody is in the child's best interest. *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 26. The relevant statute, R.C. 2151.414(D)(1), provides:

> In determining the best interest of a child * * *, the court shall consider all relevant factors, including, but not limited to, the following:
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

14.

(e) Whether any of the factors in divisions (E)(7) to (11) of this

section apply in relation to the parents and child.

{¶ 39} R.C. 2151.414(D)(1) does not require a juvenile court "to expressly discuss each of the best-interest factors." *In re A.M.* at ¶ 31. "Consideration is all the statute requires, [but] a reviewing court must be able to discern from the magistrate's or juvenile court's decision and the court's judgment entry that the court satisfied the statutory requirement that it consider the enumerated factors." *Id.* at ¶ 31. In *In re A.M.,* the Ohio Supreme Court declined to "graft into" the statute a requirement that a juvenile court include a written discussion or express findings regarding each of the best-interest factors into its decision. But, it urged juvenile courts—as a "best practice"—to "specifically address each factor" because doing so "likely * * * increase[s] public confidence in this most important area of parental rights." *Id.* at ¶ 32.

{¶ 40} We review a trial court's determination in a permanent custody case under a manifest-weight-of-the-evidence standard. *In re P.W.*, 6th Dist. Lucas No. L-12-1060, 2012-Ohio-3556, ¶ 20. In doing so, we must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the decision must be reversed. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). But, while we review the evidence and consider the witnesses' credibility, we must be mindful that the juvenile court, as the trier of fact,

15.

is in the best position to weigh evidence and evaluate testimony. *In re P.W.* at ¶ 20. Its discretion in determining whether an order of permanent custody is in the best interest of a child "should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." (Internal quotation marks and citations omitted.) *In re C.P.*, 10th Dist. Franklin No. 08AP-1128, 2009-Ohio-2760, ¶ 10.

### B. The manifest weight of the evidence supports the trial court's finding that an award of permanent custody to JFS is in the children's best interest.

{¶ 41} We now turn to the juvenile court's judgment entries that overruled mother's objections and adopted the magistrate's decisions. Pursuant to Juv.R. 40(D)(4)(d), if timely objections to a magistrate's decision are filed, the juvenile court "shall undertake an independent review as to the objected matters to ascertain that the magistrate has properly determined the factual issues and appropriately applied the law."

{¶ 42} Here, the juvenile court properly noted its obligation to conduct a "de novo" review of the record of these cases, which included the audio recording of the trial. *Barker v. Barker*, 6th Dist. Lucas No. L-00-1346, 2001WL477267, *3 (May 4, 2001) (An independent review is "the equivalent of a *de novo* determination.").

{¶ 43} In her first assignment of error, mother argues that the juvenile court's best interest determination was against the manifest weight of the evidence. We address each of the juvenile court's findings below.

16.

### 1. Children's Interactions and Interrelationships

{¶ 44} With respect to the best interest factor set forth in R.C. 2151.414(D)(1)(a), regarding the child's relationship with others, the court found,

> [The children] have regular contact with Mother. JFS testified that Mother is detached in her visits. Mother also shows little ability to identify problem behaviors, set limits and provide appropriate food for [T.J.]. Mother lives with Maternal Grandmother who will not permit JFS and the GAL into her home. There is no apparent relationship with this grandmother as no evidence was offered about this. Paternal Grandmother was never mentioned at trial either. Father [of J.C.] refused to be involved. * * * Father [of T.J.] did visit until he was sent to prison for selling drugs from the family residence. [The children, J.C. and T.J.,] ha[ve] a close relationship with [one another]. J.C. also has two half-siblings that Mother lost custody of previously. [J.C. and T.J. have] contact with these siblings during Mother's visits. [J.C. and T.J.] ha[ve] been integrated into [their] foster family and ha[ve] been primarily cared for by persons other than Mother for over half of [their] life. [The children are] thriving in [their] placement and [are] in school and performing at age level. (Judgment Entries at 5).

17.

{¶ 45} Mother does not challenge any of the court's findings. Rather, she argues that the evidence established that the children have "positive relationship[s]" with *all* of the people in their lives, including mother.

{¶ 46} Upon review, we agree that the evidence clearly established that J.C. and T.J. are "closely bonded" with mother and that mother "loves her children." But, the statute requires that a court examine not only the children's relationships with others but also their "interaction." Thus, it was appropriate for the court to consider, not just that mother and children love one another, but also their behavior in one another's presence. Therefore, the court's reference to mother's "detach[ment]" and her unwillingness or inability to discipline were also relevant. Moreover, the record supports the court's findings. Indeed, the GAL observed that T.J. was frequently "unruly" and "defiant" during his visits with mother. And, mother was described as lacking "any ability to parent for longer than 4 hours per week. And, even with that, visitation monitors must intervene to appropriately re-direct or discipline the children." By contrast, the GAL observed that J.C. and T.J. are "well-adjusted in their foster home placement" and "exhibit signs of comfort, security, love and bonding in this placement."

{¶ 47} We find that the weight of the evidence supports the juvenile court's findings and that the court properly considered R.C. 2151.414(D)(1)(a).

18.

## 2.  The Children's Wishes

{¶ 48} With respect to R.C. 2151.414(D)(1)(b), the trial court found that the children were "too young to express [their] own wishes.  [Their] Guardian Ad [L]item testified in this matter and submitted a written report prior to trial.  The GAL recommends that the Motion[s] be granted."

{¶ 49} Indeed, the GAL recommended that placing the children in JFS's custody would be in their best interest.  In arriving at that conclusion, the GAL determined that T.J. aged five, lacked "sufficient maturity to express his wishes regarding permanency." But, the GAL determined that J.C., aged nine, "*does have* sufficient maturity to express her wishes regarding permanency."  (Emphasis added.)

{¶ 50} As an initial matter (and although not raised by mother), we note that it is immaterial that the trial court incorrectly stated that J.C. was "too young" to express her own opinion on this matter.  The GAL interviewed J.C. regarding her wishes, and the GAL recognized that J.C. had the maturity to express her own opinion.  The trial court then relied upon the GAL's testimony and written report when considering the best interest of the children as required by section (D)(1).  And, importantly, R.C. 2141.414(D)(1)(b) expressly states that the court should consider "[t]he wishes of the child, as expressed directly by the child *or through the child's guardian ad litem*, with due regard for the maturity of the child."  *See In re S.M.*, 4th Dist. Highland No. 14CA4, 2014-Ohio-2961, ¶ 32 (R.C. 2151.414(D)(1)(b) permits a court to consider a child's

19.

wishes as a child directly expresses them or through the guardian ad litem). That is exactly what happened here.

{¶ 51} On appeal, mother mainly takes issue with the GAL's recommendation, arguing that the evidence established that "J.C. clearly prefer[s] to live with her mother."

{¶ 52} After conducting an "independent interview with [J.C.]," the GAL made the following observations:

> [J.C.] desires to be returned to a safe home with her mother as her primary caretaker. But, she has reasonable doubts that her mother can independently provide for her safety, security, and basic needs. She wants to maintain a relationship with her mother, but with the security of her foster placement. She believes that mother will not make her do her homework or otherwise study for school. Sadly, [J.C.] views this as a positive.

{¶ 53} Thus, J.C.—who was described as a "pretty sharp kid"—was clearly able to discern that what she wished for might not be possible. Indeed, the GAL testified at trial that J.C. anticipated feeling "disappointment" in the event "'Mom can't get it together enough to get us back home.'" The GAL's recommendation—that permanent custody of J.C. be granted to JFS, notwithstanding J.C.'s complicated feelings on the matter—was appropriate, and the trial court properly considered the GAL's recommendation under R.C. 2151.414(D)(1)(b). *Accord In re D.M. Child.*, 9th Dist. Summit No. 22206, 2004-

20.

Ohio-6369, ¶ 45 (Juvenile court was entitled to consider that the children's desire to return to their home, as expressed by the GAL, was "contingent upon the home being functioning, safe and stable. With other evidence fully supporting a conclusion that the home was not functioning, safe, and stable, the juvenile court's finding on this point— that the children wished to be adopted—fairly reflects an implicit interpretation of the children's wishes.").

{¶ 54} We find that the children's wishes, as expressed by the GAL, favored JFS under R.C. 2151.414(D)(1)(b) and that the juvenile court's decisions were not against the manifest weight of the evidence.

### 3. Custodial History

{¶ 55} With respect to Section (D)(1)(c), regarding the "custodial history" of the children, the court found that the children were removed from mother's custody on February 10, 2017 and remained in the custody of JFS for "over 12 consecutive months" of a consecutive 22 month period, as of the October 10, 2019 trial.

{¶ 56} Mother concedes that the timeliness threshold for temporary custody in these cases were met, but she argues that the "length of time that a child remains in * * * temporary custody * * * is often within the discretion of the agency itself [because] the agency determines when a parent is ready for reunification."

{¶ 57} We are unpersuaded, especially in light of the fact that, even before JFS initiated these proceedings, J.C. lived "primarily" and at times *exclusively* with a family

21.

friend. As the trial court found, mother voluntarily "abdicated physical custody" of J.C. Mother also admitted that she failed to comply with her mental health and housing case-planning requirements, which further delayed reunification. These facts support the trial court's finding—that R.C. 2151.414(D)(1)(c) weighed in favor of granting permanent custody to JFS.

### 4. Legally Secure Permanent Placement

{¶ 58} With respect to Section (D)(1)(d), regarding the children's "need for a legally secure placement," the court found that the children were in need of such a placement. It specifically found that "[t]here are no relatives [who] have been identified as placement for the [children]. As previously found, the [children] cannot be placed with Mother or Father in the foreseeable future. The child[ren] [are] in a stable foster home."

{¶ 59} Although the Ohio Revised Code does not define the term, "legally secure permanent placement," courts have generally interpreted the phrase to mean "a safe, stable, consistent environment where a child's needs will be met." *In re M.B.*, 4th Dist. Highland No. 15CA19, 2016-Ohio-793, ¶ 56, *see also In re K.M.*, 10th Dist. Franklin Nos. 15AP-64 and 15AP-66, 2015-Ohio-4682, ¶ 28 (observing that legally secure permanent placement requires more than stable home and income but also requires an environment that will provide for child's needs).

22.

{¶ 60} On appeal, mother raises two arguments. First, she claims that JFS failed to "provide proper supports to [her in] obtaining stable housing after she was evicted."

{¶ 61} According to the record, mother would have qualified for rental assistance if she could show that she was employed. Mother did not apply for such assistance and did not report her eviction until after-the-fact. Mother can hardly complain about a lack of support in the face of "her continued lies," especially where her housing was concerned. As case-manager Moen testified,

> It was very hard when [mother] wasn't being honest for me to know what she needed from me to do. She would keep telling me she has a job. And when we tried to check, she wasn't there. Telling me that she was getting this house, and then she wouldn't get a house. Or when she would give me an address of a house, it was condemned. So it was consistent. It continued like that.

{¶ 62} We find that the juvenile court's consideration of mother's lack of housing as a factor under R.C. 2151.414(D)(1)(d) was proper. *In re Waliyyudden*, 6th Dist. Lucas Nos. L-04-1174, L-04-1182, 2004-Ohio-7076, ¶ 49 (Finding clear and convincing evidence that mother failed to provide adequate, safe housing. At the time of the hearing, mother had not yet obtained housing and "only had a vague plan as to how she would set up a household.").

23.

{¶ 63} Second, mother complains that JFS failed to "perform its due diligence with regard to locating a Kinship placement or alternative custodian for the children." Mother claims that "several individuals * * * came forward" to express interest in "taking the children."

{¶ 64} According to the record, the agency identified no suitable alternatives to recommend for legal custody, but not for lack of effort on its part. Although not identified specifically by mother, the record indicates that two women, Crystal Jenkins and Jerry Watson, approached JFS in November of 2017 about serving as custodians to T.J. and were given the "packet of paperwork." The applicants, both women who "live[d] together" at R.J.'s home, submitted the application to JFS twice, both times incomplete. Normally, a family member has 30 days to complete the paperwork, but here, the application was "held open" for almost three months "because there was back and forth communication" with the agency. After the three months, in January of 2018, the women were "clos[ed] * * * out" from consideration.

{¶ 65} Another potential placement was with mother's brother, Ethan Morrow Norwood. He, too, was given an application, but he never returned it, despite the fact that the agency sent him a letter and left two voicemails. Likewise, mother's father, Richard Eddington, came forward to make an inquiry about his ability "to help," but he did not submit an application.

24.

{¶ 66} In sum, the record does not support mother's claim that JFS "failed to follow up" with any potential placement, and the juvenile court's finding—that no suitable relatives were identified as a placement for the children—was supported by the record.

### 5. R.C. 2151.414(D)(1)(e)

{¶ 67} Based upon its review of the first four factors under R.C. 2151.414(D)(1)(a) through (d), the court concluded that it was in the best interests of the children that JFS's motions be granted. The juvenile court made no specific finding with respect to the fifth factor, i.e. R.C. 2151.414(D)(1)(e) ("Whether any of the factors in divisions (E)(7) through (11) of this section apply in relation to the parents and child.") The factors in R.C. 2151.414(E)(7) through (11) involve, respectively, a parent's having been convicted of or having pled guilty to specific criminal offenses; a parent's withholding of medical treatment or food from the child; a parent's repeatedly placing the child at substantial risk of harm because of alcohol or drug abuse; a parent's abandoning the child; and a parent's having had parental rights as to the child's sibling involuntarily terminated. *See In re A.M.* at ¶ 19.

{¶ 68} Even though the trial court made no specific findings with respect to Section (D)(1)(e) of the statute, the record contains no evidence that any of those factors apply, and no party has argued otherwise. *Id.* at ¶ 36, citing *In re K.H.*, 9th Dist. Summit No. 27952, 2016-Ohio-1330 ("Because no evidence was presented to the trial court that

25.

any of the factors set forth in Sections 2151.414(E)(7) through (11) applied, * * * the trial court was not required to discuss or make findings under" R.C. 2151.414(D)(1)(e)). Accordingly, we conclude that the absence of a factual finding—that R.C. 2151.414(E)(7) through (11) are inapplicable—does not demonstrate prejudicial error. *Accord In re A.M.* at ¶ 36.

{¶ 69} In determining whether a trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *In re C.M.,* 4th Dist. Athens Nos. 17CA16, 17CA17, 2017-Ohio-9037, ¶ 73, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990).

{¶ 70} Having examined the record, we conclude that the court had sufficient evidence, and that its decision was not against the manifest weight of the evidence. Accordingly, we find that mother's first assignment of error—that the trial court erred in its best interest determination—is not well-taken.

### C. The manifest weight of the evidence supports the trial court's finding that mother failed to substantially comply with her case plan.

{¶ 71} In her second assignment of error, mother challenges the trial court's finding that she did not comply, or did not substantially comply, with her case plan, which she claims "is a necessary part of the best interest analysis."

{¶ 72} While evidence of case plan compliance is relevant to a best-interest determination, it is not dispositive of it. *Matter of M.W.* 10th Dist. Franklin No. 19AP-

26.

769, 2020-Ohio-5199, ¶ 57, *see also In re J.H.,* 12th Dist. Clinton Nos. CA2015-07-014, CA2015-07-015, 2016-Ohio-640, ¶ 47 ("Although not enumerated as a best interest factor in R.C. 2151.414(D), parental completion of case plan services is a relevant factor in determining a child's best interest in a permanent custody case.").

{¶ 73} Here, the juvenile court found that mother had, at best, mixed success, with respect to her case planning. It made the following findings:

> Mother completed several case plan requirements successfully. Mother was assessed as needing substance abuse counseling and she completed those requirements successfully and was discharged from substance abuse treatment. Mother also obtained a mental health assessment but her attendance was sporadic. For example, she missed appointments for 3 months before the trial of the Motion for Permanent Custody. Mother also completed her parenting assessment and she completed parenting classes. Unfortunately, it appears Mother didn't internalize or attempt to implement what she learned because she was observed to be distant in her visits, she has been unable to set limits with her children, unable to detect/correct inappropriate behavior without prompting from monitors, and persisted in bringing inappropriate food for her son during the visits. * * *

27.

Mother has not been able to maintain stable employment and she reported to JFS that she's had 10 different jobs during the case pendency. JFS was only able to verify one employer, McDonalds. Mother has also been unable to obtain stable housing. Mother did have her own housing for over six months but was evicted from that residence. JFS and the GAL claim they were never allowed to view this residence as Mother kept putting it off until she was evicted. * * * Mother refused all JFS help relating to housing and Mother testified that she knew JFS could not approve housing unless they inspected it.

Complicating the case is the fact that Mother has not been honest with JFS. She testified that she has held various jobs during the pendency of the case, but JFS was only able to verify one employer. * * * (Judgment Entries at 2-3).

{¶ 74} First, the case managers and GAL all testified that mother made "insufficient progress toward her case plan goals" and specifically, that her parenting skills did not improve over the course of the case plan.

{¶ 75} On appeal, mother complains that JFS's six-month housing and employment requirement was "arbitrary." But, as explained by case-manager Moen, it is "standard" for JFS to include a six-month requirement when a parent lacks housing or employment because, if a parent "can do a minimum of six consecutive months," then a

28.

parent can show that she "can be stable in [her] housing and employment." According to Moen, mother was homeless "during the entire time" she served as case manager. And, although mother was able to secure housing for six months in the first half of 2019, before her eviction in July, JFS had already filed for permanent custody, in January, having determined that mother had demonstrated an inability "to provide for [the children's] basic needs" and was therefore "unable at this time to keep them safe."

{¶ 76} Nonetheless, mother argues that she achieved "substantial compliance" with her case plan *and* that her achievement outweighed the trial court's findings under R.C. 2151.414(D)(1)(a)-(d). But, "R.C. 2151.414(D) does not require a court to deny a children services agency's motion for permanent custody solely by virtue of a parent's substantial compliance with the case plan," as substantial compliance with a case plan is "but one of many factors the court may find relevant * * * in rendering its judgment." *Id.* at ¶ 57. Here, the juvenile court found that the best interest factors supporting an award of permanent custody to the agency outweighed mother's completion of parts of her case plan. We find that the evidence supports that decision. Therefore, we find that mother's second assignment of error is not well-taken.

## IV. Conclusion

{¶ 77} For the reasons expressed above, we find that the juvenile court's decisions were supported by clear and convincing evidence and were not against the manifest weight of the evidence. We find that mother's assignments of error are without merit.

29.

Therefore, the March 2, 2021 judgments of the Erie County Court of Common Pleas, Juvenile Division, are affirmed.  Pursuant to App.R. 24, costs of this appeal are assessed to mother.

Judgments affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.

Gene A. Zmuda, P.J.

Myron C. Duhart, J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.