[Cite as *In re E.D.-P.*, 2026-Ohio-1294.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re E.D.-P.                                                    Court of Appeals No.  {48}L-25-00246

Trial Court No.  24302222

**DECISION AND JUDGMENT**

Decided:  April 9, 2026

* * * * *

Anthony McGeorge, for appellee.

Laurel A. Kendall, for appellant.

* * * * *

**SULEK, J.**

{¶ 1} Appellant S.D. ("Mother") appeals the judgment of the Lucas County Court of Common Pleas, Juvenile Division, terminating her parental rights and awarding appellee Lucas County Children Services ("LCCS") permanent custody of the minor child E.D.-P.  For the reasons that follow, the juvenile court's judgment is affirmed.

### I. Factual Background and Procedural History

{¶ 2} LCCS has an extensive history with this family.  Mother has four children with father S.P.[1]  In January 2023, legal custody of the oldest child was awarded to a

---

[1] Father did not participate in the permanent custody hearing and has not filed an appeal. This court, therefore, will focus its analysis on the issues pertaining to Mother.

relative following concerns of domestic violence between the parents, domestic violence between the parents and another adult in the home, and educational neglect. While that case was pending, Mother had her second child. Mother tested positive for marijuana at the time of the second child's birth. In July 2022, the second child was adjudicated dependent and temporary custody was awarded to LCCS. During the pendency of the second child's case, Mother had her third child. The third child was adjudicated dependent in August 2023 amidst concerns pertaining to a lack of stable housing for the parents, ongoing substance abuse, and lack of engagement in or completion of case plan services. Ultimately, the juvenile court awarded permanent custody of the second and third children to LCCS in May 2024. In awarding permanent custody, the juvenile court found that the parents had failed to remedy the conditions that led to the children's removal, the parents had failed to support or visit the children, the parents lacked stable housing, and the father had abandoned the children.

{¶ 3} In October 2024, Mother had her fourth child, E.D.-P., the child at issue in this appeal. LCCS received a referral alleging that Mother had a history of other children being removed from her care and that she tested positive for marijuana in July 2024 and at the delivery of E.D.-P. three months later. LCCS filed a complaint in dependency. It then filed an amended complaint seeking permanent custody. On January 7, 2025, the juvenile court adjudicated E.D.-P. a dependent child.

{¶ 4} At the dispositional hearing on February 28, 2025, LCCS orally moved to dismiss its request for permanent custody and instead sought temporary custody of E.D.-P. while it pursued a potential placement with a relative. The juvenile court granted

2.

LCCS's motion and temporary custody was awarded to the agency. The juvenile court further found that LCCS was not required to make reasonable efforts for reunification pursuant to R.C. 2151.419(A)(2)(e).[2]

{¶ 5} On March 7, 2025, E.D.-P. was placed with paternal relatives in the state of Texas. On May 29, 2025, LCCS moved for permanent custody. The agency noted that the current caregivers were a potential adoptive home.

{¶ 6} The juvenile court held a hearing on the motion for permanent custody on August 28, 2025. At the hearing, Rachel Newton, the ongoing caseworker, testified that while the agency did not provide any case plan services in this case, Mother did seek out and complete a parenting class in April 2025. In addition, as part of a prior case, Mother completed a dual diagnostic on February 27, 2024, which recommended weekly therapy. Mother attended therapy for some time, but her last date of attendance was January 30, 2025. Newton was unaware of any other services in which Mother was currently engaged.

{¶ 7} Regarding visits, Newton testified that visitation started on October 23, 2024, and Mother initially attended. She visited consistently for two-and-a-half months, but then missed seven visits between January 9, 2025, and February 20, 2025, and was taken off the schedule on February 27, 2025. Mother explained to Newton that she had

---

[2] R.C. 2151.419(A)(2)(e) provides that "the agency is not required to make reasonable efforts to prevent the removal of the child from the child's home, eliminate the continued removal of the child from the child's home, and return the child to the child's home," where "[t]he parent from whom the child was removed has had parental rights involuntarily terminated with respect to a sibling of the child . . .."

3.

issues with transportation. Newton offered bus passes, but Mother did not feel comfortable riding the bus. Newton then offered gas cards, but Mother did not have anyone to transport her using those cards. After the child was placed with the paternal relatives in Texas on March 7, 2025, Mother has attended only one virtual visit with E.D.-P. She does, however, speak on a near-daily basis with the caregivers and receives regular updates from them.

{¶ 8} Newton also described Mother's living situation. She currently resides with S.P. and an adult woman named "Heather." S.P. and Heather were involved in the domestic violence incidents that precipitated the removal of Mother's oldest child. Newton testified that the situation is "pretty much the same" as it was when LCCS was awarded permanent custody of Mother's second and third children. She noted that neither parent has followed the recommendation of the psychological evaluation, and there are continued concerns of substance use, mental health, and domestic violence. Newton also testified that Mother tested positive for marijuana at the beginning of the case in November 2024. She was asked to test again in January 2025, but Mother had transportation barriers and conveyed to Newton that she already knew that she was going to test positive for marijuana, so "what's the point." S.P. has not participated in any services and has not attempted to visit with E.D.-P.

{¶ 9} In response to questioning by the guardian ad litem, Newton testified that the paternal relatives in Texas are providing good care for E.D.-P. E.D.-P. has "some significant delays" and the caregivers are working with physical therapists, occupational therapists, and doctors to help her "catch up." Newton remarked that E.D.-P. is doing

4.

very well and appears to be very bonded with the paternal relatives. She further explained that the paternal relatives are a military family and are seeking adoption to ease any difficulties associated with an overseas deployment. The family gets along well with Mother and remains committed to facilitating a relationship between her and E.D.-P.

{¶ 10} Mother testified next. Mother testified that she is working full-time and earns enough to provide financial stability for herself and E.D.-P. She stated that she is currently residing in an apartment with S.P. and Heather. She has searched for alternate housing but has been denied by four different apartment complexes due to insufficient landlord references. She, however, is still looking and is also researching how to obtain a first-time homebuyer's loan. Mother also expounded on previous attempts to obtain housing independently from S.P. and Heather by moving into a long-stay hotel. She explained that she did so during the permanent custody case involving her second and third children, but the juvenile court nonetheless awarded permanent custody of those children to LCCS, so she did not trust that similar efforts in this case would be successful.

{¶ 11} Regarding the visits, Mother explained that she cannot communicate with E.D.-P. because she is a baby, but she sees pictures of her every day and communicates with the caregivers nearly every day. She further explained that before E.D.-P. moved to Texas, Mother had transportation issues preventing her from in-person visits. Mother had suggested offsite visits at locations she could walk or bike to, but LCCS denied those requests even though there were no expressed concerns during any of her visits.

{¶ 12} Mother also testified that she had completed the old case plan services before 2022, but no services were offered and there were none for her to complete in this

5.

case. She did complete a parenting class in April 2025, through which she gained knowledge on the importance of bedtime schedules, gentle discipline, feeding schedules, and schooling.

{¶ 13} She next stated that there were no concerns for harm for E.D.-P. She has lived in the same household with S.P. and Heather for the past four years and there have been no new incidents of domestic violence. She described her household as "tame."

{¶ 14} Regarding her marijuana usage, Mother testified that she has a medical marijuana card and still uses the drug.

{¶ 15} Finally, Mother testified that she is happy with her recommendation to send E.D.-P. to live with the paternal relatives in Texas. Prior to that, E.D.-P. was not well-cared for by the foster family; she was constantly filthy and had a musty, moldy odor. Now, E.D.-P. is very safe, cared for, and loved by the family in Texas. Mother testified that she absolutely loves E.D.-P., as well as her other children, and just wants the opportunity to prove that the work she has done over the past four years can allow her to raise E.D.-P.

{¶ 16} Jill Wolff, the guardian ad litem, testified last. Wolff described E.D.-P. as a typical child, although she is delayed and not meeting milestones. She also noted that E.D.-P. may have a genetic issue that could be contributing to her developmental delays. The current caregivers are working with specialists, therapists, and geneticists to meet E.D.-P.'s needs. Wolff has no concerns about their care.

{¶ 17} Regarding Mother's ability to independently parent E.D.-P., Wolff's main concern is that she continues to live with S.P. and Heather. She noted a prior

6.

psychological evaluation that assessed that Mother and S.P. should not parent together. Wolff expressed that S.P. has made no effort or shown any interest in being a parent. He has substance abuse and mental health issues, and he has not participated in any therapy, parenting classes, or other services. Furthermore, Wolff expressed concern that it appears that Mother is "controlled" by S.P. According to Wolff, Mother has a different personality when she is talking to her from work, versus when she is talking to her from home when S.P. is around. She described Mother's relationship with S.P. as "co-dependent."

{¶ 18} Wolff also testified regarding Mother's previous efforts to obtain independent housing at the hotel. Wolff explained that it was not that the hotel housing was inappropriate, but that it was too short of a duration. Mother only stayed in the independent housing for approximately one month or six weeks. Wolff testified that was not long enough for her to consider it stable, independent housing.

{¶ 19} Ultimately, Wolff believed permanent custody of E.D.-P. to LCCS was in the child's best interest. She stated that but for the caregivers' status as a military family, legal custody could have been an option. Because of the possibility of an overseas deployment, however, the caregivers are only interested in adoption. Wolff noted that this is not a situation where there is a conflict between the mother and the caregivers leading the caregivers to no longer want to maintain a relationship. On the contrary, their intention is to continue to have contact with Mother.

{¶ 20} Finally, Wolff summarized the matter as: "[T]he child loves mom, mom loves the child, that's not really the issue here, it's just we have years with this family and

7.

the living situation to me would have been the first step to maybe see if mom could have done it to reunify, but we're still sitting here with in (sic) the same situation."

{¶ 21} In its September 9, 2025 judgment following the hearing, the juvenile court awarded permanent custody of E.D.-P. to LCCS. The juvenile court found that R.C. 2151.414(B)(1)(a) applied and that E.D.-P. could not be placed with Mother within a reasonable period of time because Mother "has had parental rights involuntarily terminated with respect to a sibling of the child . . . and [she] has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, [she] can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child" pursuant to R.C. 2151.414(E)(11), and because Mother "has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child" pursuant to R.C. 2151.414(E)(4). The juvenile court further found that permanent custody was in the best interest of E.D.-P.

## II. Assignments of Error

{¶ 22} Mother timely appeals the juvenile court's September 9, 2025 judgment, asserting two assignments of error for review:

> 1. The trial court abused its discretion when it found that mother had demonstrated a lack of commitment toward the child, pursuant to R.C. 2151.414(E)(4), when the child lived in Texas, and when the child was a delayed 8-month old, such that visits with the child were difficult to effect, but when mother undisputedly had frequent, if not daily contact with the foster mother.

8.

2. The trial court abused its discretion when it found that mother had failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, she can provide a legally secure permanent placement and adequate care for the health, welfare and safety of the child, pursuant to R.C. 2151.414(E)(11).

### III. Analysis

{¶ 23} In order to terminate parental rights and award permanent custody of a child to a public services agency under R.C. 2151.414, the juvenile court must find two things by clear and convincing evidence: (1) that one of the enumerated factors in R.C. 2151.414(B)(1)(a)-(e) apply, and (2) that permanent custody is in the best interests of the child. R.C. 2151.414(B)(1). Clear and convincing evidence is that which is sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. *In re T.J.*, 2021-Ohio-4085, ¶ 36 (6th Dist.), citing *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. The clear and convincing standard requires more than a preponderance of the evidence, but it does not require proof beyond a reasonable doubt. *Cross* at paragraph three of the syllabus.

{¶ 24} R.C. 2151.414(B)(1)(a) provides that a trial court may grant permanent custody of a child to the agency if it finds that, in addition to the placement being in the best interest of the child,

> The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, . . . and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

9.

R.C. 2151.414(E) requires a trial court to find that a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with either parent if any of sixteen factors are met.

{¶ 25} Here, the trial court found that R.C. 2151.414(E)(4) and (11) applied. Mother challenges the R.C. 2151.414(E)(4) finding in her first assignment of error, and the R.C. 2151.414(E)(11) finding in her second assignment of error. Because "[t]he court only needed to find that one factor applied to support its holding," *In re C.F.*, 2007-Ohio-1104, ¶ 50, citing R.C. 2151.414(E), this court will begin and end its analysis with Mother's second assignment of error. Notably, Mother does not raise an assignment of error concerning the juvenile court's best interest finding.

{¶ 26} R.C. 2151.414(E)(11) provides that the juvenile court "shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent" if it finds by clear and convincing evidence that "[t]he parent has had parental rights involuntarily terminated with respect to a sibling of the child . . . and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child."

{¶ 27} "A trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence." *In re A.H.*, 2011-Ohio-4857, ¶ 11 (6th Dist.), citing *In re Andy-Jones*, 2004-Ohio-3312, ¶ 28 (10th Dist.); *see also In re Z.C.*, 2023-Ohio-4703, ¶ 11 ("Given that R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements

10.

are met, . . . the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the nature of the arguments that are presented by the parties."). "Reversal is proper only where its determined, after weighing the evidence and all reasonable inferences including the credibility of the witnesses, that the juvenile court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed." *In re S.S.*, 2023-Ohio-1663, ¶ 27 (6th Dist.), citing *In re T.J.* at ¶ 40, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

{¶ 28} Mother argues that she has demonstrated that she can provide legally secure placement and adequate care for the health, welfare, and safety of E.D.-P. To that end, she has taken a parenting class with no negative comments or concerns. She regularly visited E.D.-P. during the first few months with no issues and has maintained nearly daily contact with E.D.-P.'s current caregivers. She has a history of full-time employment and believed that she made enough money to support E.D.-P. and herself. And although she continued to live with S.P. and Heather, she expressed her willingness to find independent housing. She also maintains that there is no evidence that her current living arrangement is dangerous to E.D.-P. or inadequate in any way as the record shows no incidents of domestic violence since 2021. Taken together, she asserts that the circumstances are different from when LCCS was awarded permanent custody of her second and third children.

11.

{¶ 29} Upon review, this is not a case where the juvenile court clearly lost its way and created a manifest miscarriage of justice. When the juvenile court awarded permanent custody of Mother's second and third children to LCCS, it found "particularly persuasive" the psychological reports that evaluated an "imperative" need for the parents to obtain independent housing. It reasoned that although Mother did make the "seemingly positive step" of obtaining an independent living arrangement, she continued to be reliant on S.P. and Heather. The fact that Mother had not demonstrated independence from S.P. and Heather was central to its decision to award permanent custody of the children to LCCS.

{¶ 30} Since that time, the circumstances have not changed. Mother continues to reside and be co-dependent with S.P. There continue to be concerns that S.P. is controlling. S.P. has made no effort or demonstrated any desire to parent his children by working with LCCS, visiting with E.D.-P., or speaking with her caregivers. For these reasons, the juvenile court's finding that R.C. 2151.414(E)(11) applied, in that Mother has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, she can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child, is not against the manifest weight of the evidence.

{¶ 31} Accordingly, Mother's second assignment of error is not well-taken.

{¶ 32} As noted above, since only one R.C. 2151.414(E) factor is necessary to support the juvenile court's decision, Mother's first assignment of error challenging the trial court's finding under R.C. 2151.414(E)(4) is moot.

12.

## IV. Conclusion

**{¶ 33}** For the foregoing reasons, the September 9, 2025 judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Mother is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, P.J.                      _____

                                                  JUDGE

Gene A. Zmuda, J.                       

                                        _____

Charles E. Sulek, P.J.                      JUDGE
CONCUR.

                                        _____

                                                  JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.