[Cite as *In re J.T.*, 2023-Ohio-4681.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re: J.T., R.T.

Court of Appeals No.  L-23-1181

Trial Court No.  21286034

**DECISION AND JUDGMENT**

Decided:  December 21, 2023

* * * * *

Janna E. Waltz, Lucas County Prosecuting Attorney for, appellee.

Laurel Kendall, for appellant.

* * * * *

**SULEK, J.**

**{¶ 1}** Appellant-father, James T., appeals the judgment of the Lucas County Court of Common Pleas, Juvenile Division, which terminated his parental rights and awarded custody of the minor children, J.T. and R.T., to appellee Lucas

County Children Services ("LCCS").  For the reasons that follow, the juvenile court's judgment is affirmed.

## II.     Facts and Procedural Background

{¶ 2} James T. is the father of J.T., born in 2013, and R.T., born in 2017.[1] The present matter was initiated on September 2, 2021, when LCCS filed a complaint in dependency, abuse, and neglect.

{¶ 3} The complaint alleged that on August 20, 2021, LCCS received a referral that the children were residing with their mother and mother's boyfriend, both of whom had substance abuse problems, with mother using methamphetamine and recently overdosing on heroin, and her boyfriend using methamphetamine and marijuana.  The referral also stated that R.T. had been observed holding a torch lighter and in possession of a THC vape pen.  It further detailed that mother and her boyfriend had left the children unsupervised all day while mother and her boyfriend were intoxicated.  Finally, the referral stated that EMS and law enforcement had been notified that R.T. had ingested substances. LCCS investigated the referral and confirmed some of the allegations and determined others were inaccurate.

{¶ 4} According to the complaint, mother admitted to LCCS that she had a history of heroin use and was still using marijuana.  Mother also claimed that she

---

[1] J.T. and R.T.'s mother has not appealed the juvenile court's termination of her parental rights.

2.

completed services at Aurora House and had been sober since 2019. The children told LCCS that mother did not use drugs but they had seen father use needles.

{¶ 5} Regarding father, the complaint alleged that he had an active warrant arising out of charges in Toledo Municipal Court for making false alarms and misuse of the 911 System. A Toledo Police report stated that father had called 911 and falsely reported that R.T. had ingested methamphetamine. Father had also recently been released from prison in Michigan on parole.

{¶ 6} In addition, the complaint alleged that a custody dispute existed between mother and father. Father claimed that he had been given custody of the children while mother was undergoing treatment for substance abuse. Father then went to prison, and the children lived with relatives in Michigan until two months before the referral. At that time, according to father, the children began living with mother. Mother alleged that the children had been living with her since February 2021. LCCS was unable to confirm custody.

{¶ 7} Finally, the complaint alleged that both mother and father failed to complete a drug screen as requested.

{¶ 8} At a shelter care hearing on September 2, 2021, the juvenile court ordered that the children would remain in mother's home and LCCS would provide protective supervision. Further, due to concerns about domestic violence, mother's boyfriend was ordered to vacate mother's residence and the court issued an order prohibiting mother's boyfriend from having any contact with the children.

3.

{¶ 9} The juvenile court ordered that: (1) mother and father undergo a dual diagnostic assessment and substance abuse screening; (2) J.T. be enrolled in school immediately and R.T. to be enrolled in protective day care; and (3) J.T. and R.T. not be removed from the jurisdiction.

{¶ 10} On September 14, 2021, the juvenile court issued an ex parte order determining that LCCS was to take shelter care custody of the children, and the children were placed in an emergency foster home.

{¶ 11} The next day, LCCS moved for an emergency shelter care hearing and requested interim temporary custody of the children. LCCS alleged that mother had failed to provide a urine screen, and LCCS had not been able to make contact with her since the shelter care hearing on September 2, 2021 despite several attempts. A neighbor told an LCCS caseworker that mother's boyfriend continued to reside with mother, and mother's boyfriend told the caseworker that mother had not told him the juvenile court had ordered him to vacate the residence. LCCS also alleged that father admitted to using fentanyl approximately 40 days earlier, and the children had been residing in Michigan, outside the court's jurisdiction, with father and father's girlfriend, Abbie McIntosh.

{¶ 12} The juvenile court held a hearing on LCCS's motion the same day and ordered the children be placed in the interim temporary custody of LCCS. The court appointed Mary Beth Orr as the children's guardian ad litem, and both parents were granted level 1 visitation with the children at LCCS. Further, the

4.

court ordered father to clear his warrants and that mother and father comply with a case plan.

{¶ 13} Under the case plan, the goal was reunification, and father was to undergo substance abuse treatment, mental health treatment, secure stable housing, and comply with the terms of his parole. In October 2021, however, father was removed from the case plan after he expressed that he did not want to engage with his LCCS caseworker.

{¶ 14} At the adjudication and disposition hearing on November 18, 2021, the juvenile court continued LCCS's temporary custody of the children and ordered father to provide a urine screen to LCCS immediately following the hearing.

{¶ 15} On December 1, 2021, the juvenile court granted father's motion for an expedited interstate home study for placement of the children with McIntosh, but the home study was later denied because father had been living with McIntosh.

{¶ 16} At a review hearing on March 10, 2022, the juvenile court noted that father had not complied with and had been removed from the case plan, but father had been participating in weekly Zoom calls with the children, and he had cleared his warrants. The children were doing well in their foster placement, and no appropriate kin placement had been found.

{¶ 17} On July 14, 2022, LCCS moved for permanent custody of J.T. and R.T. LCCS alleged that father had been linked with providers since January 2022 but had not made progress on his case plan. It alleged that father provided positive

5.

drug screens on March 8, March 22, March 23, March 30, April 6, April 14, and April 27, 2022. Additionally, father had been charged with possession of paraphernalia in March 2022, causing his parole to be extended an additional 90 days. LCCS asserted that J.T. and R.T. could not be placed with either parent within a reasonable period of time due to the circumstances listed in R.C. 2151.414(E)(1), R.C. 2151.414(E)(2), and R.C. 2151.414(E)(4).

{¶ 18} In August 2022, LCCS moved for an order extending temporary custody for an additional six months and withdrew its motion for permanent custody. Father had progressed in his mental health and substance abuse treatment, and he moved to Toledo in August 2022 to facilitate in-person visits with J.T. and R.T.

{¶ 19} At a review hearing on September 16, 2022, the juvenile court noted that father had completed a dual assessment and was engaged in dual services. The court also noted that father had started level 2 visitation at LCCS. The court found that the children should remain in the temporary custody of LCCS.

{¶ 20} On December 6, 2022, McIntosh appeared at a review meeting, reporting that father would not be attending the meeting and his whereabouts were unknown. A few weeks later, on December 22, 2022, LCCS moved for permanent custody of J.T. and R.T. again. In its motion, LCCS alleged that father was not compliant with the terms of his probation in Michigan and had an active warrant.

{¶ 21} On March 7, 2023, McIntosh filed a motion seeking legal custody of the children. Father filed a motion for an expedited home study regarding

6.

McIntosh the next day, and LCCS filed an objection to father's motion.  On April 18, 2023, father moved to extend temporary custody.  The next day, at a hearing in which father failed to appear, the juvenile court denied father's motion for an expedited home study.

{¶ 22} The juvenile court held a hearing on May 17, May 23, June 2, and June 9, 2023 on father's motion to extend temporary custody, McIntosh's motion for legal custody, and LCCS's motion for permanent custody.  On May 17, 2023, LCCS caseworker Hannah Beaudrie, and the children's guardian ad litem, Orr, were present with counsel.  In addition, an attorney for J.T. and R.T. was present.  Abbie McIntosh appeared pro se.  Although father appeared with counsel on May 17 and June 9, father was not present on May 23 or June 2. Father's counsel appeared on his behalf on the dates he was absent.

{¶ 23} At the outset of the hearing, the juvenile court considered a motion to withdraw from father's attorney.  His attorney told the court that she had not had substantial compliance from father.  She had been unable to reach father for the past couple of months despite trying to contact him numerous times through different means.  She also noted that she was his third attorney on this case.  The court denied the motion but gave father's attorney time to consult with father before beginning the hearing.

{¶ 24} The juvenile court then heard testimony from the following: Beaudrie, the LCCS caseworker who had worked with the family since October 2021; Anthony Cardenas, an LCCS employee specializing in finding children's

7.

family members for potential placement; Zahraa Saab, father's clinical therapist; and Mary Beth Orr, the children's guardian ad litem. The relevant testimony and the events occurring during the three hearing dates are summarized below. For clarity, the testimony is organized by the chronological events of the case rather than the order the testimony was given.

{¶ 25} Beaudrie testified that the case plan established in September 2021 identified several services for father, including substance abuse, mental health, housing, and compliance with his probation. Beaudrie testified that father did not initially comply with the case plan.

{¶ 26} Father did, however, visit his children beginning in October 2021 according to Beaudrie's testimony. Initially, his visits were over videoconference because the terms of his parole prohibited him from leaving Michigan, but after his parole ended, he visited the children in person at LCCS.

{¶ 27} Father began receiving some of the services from his case plan in January 2022. He was linked to Team Wellness in Southgate, Michigan for mental health services. Zahraa Saab, a clinical therapist at Team Wellness, testified that she began seeing father for therapy in January 2022 for trauma, depression, and substance use treatment. Father had weekly therapy sessions, mostly over the phone, with Ms. Saab. Father also saw a psychiatrist, Dr. Xavier White, at Team Wellness for medication.

{¶ 28} Father's Team Wellness records, admitted as an exhibit, stated that father disclosed to Ms. Saab that he had been sexually assaulted on October 7,

8.

2021, and one of the issues that Ms. Saab was addressing with father was trauma. Although father had given Ms. Saab permission to discuss his assault with the LCCS caseworker, Ms. Saab testified that she had not done so.

{¶ 29} Beaudrie testified that in March 2022, LCCS put father on a one-hour call for his visits, requiring him to call LCCS one hour ahead of the scheduled visit to confirm he would attend. LCCS puts a parent on a one-hour call to prevent the children from going to a visit and not getting to see the parent. Father continued to be on a one-hour call for several months.

{¶ 30} Beaudrie also stated that in March 2022, father was charged with paraphernalia and his probation was extended. That same month, he also began receiving substance abuse services—suboxone services—through Dr. Saab[2] in Dearborn, Michigan.

{¶ 31} Although father did have several positive drug tests in spring 2022, Beaudrie testified that father then began to make good progress with his services. In August 2022, LCCS withdrew its motion for permanent custody filed in July 2022 and moved to extend temporary custody. Father moved from Michigan to Toledo in August 2022 to facilitate his visits with his children, and he began completing drug screens for LCCS in Toledo then as well. Before father's move to Toledo, LCCS had accepted drug screenings conducted through Dr. Saab,

---

[2] Father was treated by two individuals with the same last name: Dr. Saab, who prescribed father suboxone in 2022, and Zahraa Saab, father's clinical therapist. For clarity, father's suboxone provider is referred to as Dr. Saab, and father's clinical therapist is referred to as Ms. Saab.

9.

father's suboxone provider, as well as screenings father completed as a condition of his probation in Michigan.

{¶ 32} Things began to change for father in fall 2022, around the time of the anniversary of his sexual assault. According to Ms. Saab, on September 30, 2022, father told her that he had been clean for six months and was in a good place. Saab believed father had improved at that point. Beaudrie, however, stated that father tested positive for cocaine in September 2022 in an LCCS drug screen.

{¶ 33} Beaudrie also testified that father's last appointment at Dr. Saab's office for suboxone was on October 26, 2022. Father told Beaudrie that he was planning to receive suboxone services through Hill Clinic in Toledo instead, but Beaudrie testified that father never actually received services from Hill Clinic.

{¶ 34} Team Wellness likewise reported that father's last appointment was in October 2022. Ms. Saab testified that she and father's caseworker at Team Wellness attempted to reach out to father many times, but father did not answer their calls. As a result, Team Wellness closed out his case for noncompliance.

{¶ 35} On November 3, December 8, and December 9, 2022, father failed to complete drops for his drug screening with LCCS.

{¶ 36} In November 2022, father's visits with J.T. and R.T. became less regular. He visited the children on November 7, then December 7, and then his visits ceased. Beaudrie testified that LCCS removed father from the schedule in January 2023 due to his failure to appear for visits.

10.

**{¶ 37}** Also in November 2022, Beaudrie attempted to conduct a home visit at father's Toledo address. But when she arrived, she was informed that father no longer resided there.

**{¶ 38}** Around the same time, Beaudrie learned from McIntosh that father had been sexually assaulted about a year earlier, in October 2021. Beaudrie testified that she did not speak with father about the rape, its impact, or any additional services father may need as a result. She explained that father was already connected with mental health providers, so she believed that his therapist was the best person to either provide treatment or identify additional necessary treatment. Beaudrie agreed that it was possible father may have made better progress on his case plan if father had received additional treatment to address the incident.

**{¶ 39}** In December 2022, father was admitted into Samaritan Behavioral Health, a mental health hospital, for inpatient treatment following a suicide attempt. According to his medical record, which was admitted as an exhibit, at the time of his admission, father tested positive for fentanyl and cocaine. Father also admitted to using cocaine 20 times in the previous 30 days. He was diagnosed with opioid dependence, depressive disorder, generalized anxiety, polysubstance dependence, and major depressive disorder. Beaudrie testified that to her knowledge, father was admitted into a mental health institution three times during the pendency of the case.

11.

**{¶ 40}** On January 10, 2023, father was discharged from the hospital. Before he was discharged, a medication appointment was scheduled on father's behalf with Team Wellness for January 17, 2023. Team Wellness records indicate that father was a no-show for that appointment.

**{¶ 41}** In February 2023, father reengaged with Team Wellness for mental health services, but according to Ms. Saab, father was not compliant with his treatment. Father missed seven out of fifteen appointments with Team Wellness, many of which were telephone appointments, over the next two months. Ms. Saab testified that when she asked father why he was missing appointments, father said that he was "good."

**{¶ 42}** On March 3, 2023, father completed a psychiatric evaluation with Team Wellness, and Dr. White's evaluation report indicated father was evasive and avoidant, drug seeking, and reported no substance abuse issues. The psychiatrist recommended inpatient services, case management services, and psychotropic drugs. As of May 16, more than two months after the recommendations had been made, father had not yet followed through with any of the recommendations.

**{¶ 43}** On February 15, 2023, father resumed weekly visits with J.T. and R.T. Beaudrie testified that J.T. requested to change the time of his visits with his father so he would not have to miss his sporting activities after school. Accordingly, the LCCS scheduler set the visits for noon, over J.T.'s school lunch period. Beaudrie testified that she had no role in setting the visit time—it was up

12.

to the scheduler—and she could not say whether J.T.'s sports schedule made him unavailable for all five weekday evenings. Father told Beaudrie that noon visits were difficult for him to attend due to work, and Beaudrie conveyed father's request to change the visit time to the scheduler, who was working on it. Father did appear for some of the noon visits.

{¶ 44} When father's visits first resumed, LCCS required father to be at the place of the visit one hour before the visit time (LCCS refers to this as a parent being "on a show") due to his prior missed visits. Beaudrie testified in the five weeks that father was on a show, he missed one visit out of five. LCCS then agreed to allow father to call in advance to confirm his attendance at visits to accommodate his work schedule and travel time for the visits. Beaudrie testified that father completed his last visit with his children on March 22, 2023. After father missed the next three visits, he was removed from the schedule. At the time of Beaudrie's testimony on May 16, 2023, father had not requested to resume his visits.

{¶ 45} Ms. Saab from Team Wellness testified that her last therapy session with father was on March 31, 2023. Her appointment notes stated that her sessions with father had been very surface level and his attendance was scattered. Ms. Saab also noted that she and Dr. White were questioning whether Team Wellness could provide an appropriate level of care for father. Ms. Saab testified that although in 2022 she had believed father was receiving sufficient treatment for his trauma, mental health, and substance use based on his progress at that time,

13.

she now believed that he needed inpatient care and more specialized care in trauma.

{¶ 46} Father began receiving suboxone services from Metro Hybrid Clinic in Michigan in December 2022. Beaudrie testified that father had been compliant with that service at the time of the hearing, but on March 29, 2023, father did not appear for a scheduled drug screen at Metro Hybrid Clinic.

{¶ 47} In addition, Beaudrie testified that father's last completed drug screening for LCCS was in September 2022, when he tested positive for cocaine. Father appeared for a screen at LCCS's facility in February 2023 and one in March 2023, but he did not go and he refused to complete a swab because the results could not be contested. Beaudrie also testified that father's drug screens conducted by Metro Hybrid Clinic were a concern for LCCS because they were scheduled drops rather than random drops.

{¶ 48} According to Beaudrie, father also did not comply with the terms of his probation as required by the case plan. She testified that a Michigan court had issued a bench warrant for father with a $10,000 bond for failing to appear for a hearing in April 2023.

{¶ 49} Beaudrie further noted that father had not demonstrated that he secured independent housing as required by his case plan. She did not know where father was residing at the time of the hearing. Beaudrie explained that father's contact with her had been irregular throughout the case, and the last time

14.

she saw him was in March 2023 and the last time she had spoken to him was by phone in April 2023.

{¶ 50} Beaudrie believed that father was not able to provide a safe, stable, or permanent environment for J.T. and R.T. based on father's failure to make significant progress in case plan services to address the concerns. LCCS had ongoing concerns about father's substance abuse and mental health, and father had not demonstrated he had stable housing.

{¶ 51} In addition, Beaudrie stated her belief that father would not be able to significantly remedy his problems given an extension of time to receive case plan services. She testified that father needed inpatient substance abuse treatment, which was in her experience approximately 30 days. After discharge, a patient must next complete intensive outpatient services, which generally take 10 to 16 weeks. After that, a patient must complete aftercare services for an additional 12 to 16 weeks. As such, Beaudrie testified that there was insufficient time in the case for father to demonstrate active sobriety.

{¶ 52} LCCS did not have a plan for a permanent placement according to Beaudrie. The children's foster caregivers were not certified to adopt, and they had not yet decided whether they would consider adopting J.T. and R.T. In the past, the foster parents had expressed that they did not intend to adopt, but they notified LCCS that they were reconsidering at the time of the hearing. The foster parents had agreed to keep the children until a permanent placement was found for them.

15.

{¶ 53} LCCS had not been able to identify any appropriate relatives despite conducting a search into the children's family and contacting several relatives. Anthony Cardenas, an LCCS employee whose job was to find family members of kids in foster care, testified that he had done a search of both sides of the children's family but had not identified anyone, though a cousin had very recently come forward expressing an interest in custody of the children.

{¶ 54} Beaudrie did not consider McIntosh a suitable option because father had been living with McIntosh in her home on and off throughout the case, and father was still using McIntosh's address for probation purposes. LCCS was concerned with the type of contact that McIntosh would permit father to have with the children.

{¶ 55} LCCS also had concerns with McIntosh stemming from a report it received from a caseworker from another agency who worked with the foster parents. The report, dated March 16, 2023, stated that J.T. had been coached to tell a caseworker that he wanted to live with McIntosh. J.T. told the caseworker that his father was going to marry McIntosh and she was going to be his stepmother. The caseworker was surprised because J.T. had never before expressed a wish to live with McIntosh. Later that evening, J.T. confessed to one of his foster parents that he had been coached by father to say those words, and doing so made his stomach hurt. LCCS was concerned with this report in part because of J.T.'s statement that father and McIntosh were to marry, which suggested that father and McIntosh continued to be in a relationship.

16.

{¶ 56} According to Beaudrie, it was not in the children's best interests for the court to grant McIntosh legal custody of the children because of her ongoing relationship with father. Rather, she believed it was in the children's best interests for LCCS to have permanent custody of the children

{¶ 57} Although father attended the hearing on May 17, father did not appear on May 23 or June 2, 2023. On May 23, father's attorney explained that she had just learned that father had been admitted into a mental health institution, and she requested a continuance so that father could be at the hearing. LCCS objected, arguing that the case had been continued many times already and father's timing in seeking inpatient treatment was suspect. The juvenile court denied the request for a continuance, and the hearing proceeded in father's absence.

{¶ 58} Ms. Saab testified that father had been admitted into Henry Ford Kingswood, a psychiatric hospital, on May 22, 2023. According to Ms. Saab, father was being treated for major depressive disorder, opioid use disorder, and PTSD. In addition, father had expressed interest in going to a residential treatment center for substance use after leaving Kingswood.

{¶ 59} Ms. Saab further testified that as of the date of her testimony, May 23, 2023, father still needed additional treatment for trauma. She believed that if father received the right treatment, he could potentially be ready to reunify with his children in three or four months. She also recognized, however, that he may require more substantive long-term treatment to make significant progress. He

17.

had made some progress, but Ms. Saab could not say how much more treatment he needed. She explained, "Maybe we only touched the surface. It's hard to say at this moment." Ms. Saab acknowledged that she did not know how long father would need treatment for substance abuse because she did not have enough experience in that area to give an opinion.

{¶ 60} On June 2, 2023, father's counsel informed the court that to the best of her knowledge, father would not be appearing in court for the hearing that day. Father's counsel represented that all she knew about father's whereabouts was that he had been in treatment.

{¶ 61} Finally, Orr, the guardian ad litem, testified. In addition to submitting her report, Orr testified that she did not believe that it would be in the best interest of the children to be reunified with father. Orr, who attended several of father's visits with the children, expressed concerns about father's parenting at visits. For example, Orr noted that father would bring food to the noon visits. R.T. had been in therapy for food fixation, and father had ignored Orr's request to bring in healthier foods in accordance with that therapy. Father had not addressed R.T.'s inappropriate behavior on another occasion, and father had encouraged the children to fight back rather than to run away or get an adult if they got into an altercation at school.

{¶ 62} Orr also did not recommend that McIntosh be granted legal custody of J.T. and R.T. based on McIntosh's on-again, off-again relationship with father. Orr also cited an incident in which McIntosh had unexpectedly appeared at J.T.'s

18.

baseball game. When J.T. saw her, McIntosh told him not to tell his foster parents that she was there. At the hearing, McIntosh clarified that when she said that, J.T. had then pointed behind her, where his foster parents had been standing, and McIntosh had told J.T. she was just kidding and apologized. Orr testified that even if McIntosh's explanation was true, she did not think McIntosh's actions had been appropriate. Orr emphasized that she did not think joking about J.T. hiding things from his foster parents was okay, and J.T. should not have been put in such a position.

{¶ 63} Orr testified that the children had expressed a desire to be in a permanent home situation. J.T. and R.T. had previously asked to live with father, but they had changed their minds. Orr testified that both children struggled when father was inconsistent with visitation. J.T. told Orr that he was afraid his father would use drugs. Thus, Orr stated that J.T. wanted to be adopted by his foster parents, in part because he wanted to stay in his current school system with his friends and continue playing sports. R.T. told Orr he did not want to live with his dad and wanted to live with relatives of his foster family.

{¶ 64} The children were doing well in their placement according to both Beaudrie and Orr. Both J.T. and R.T. were receiving regular counseling, and they were bonded to their caregivers. Orr testified that J.T. was doing "exceptionally well" in school and was on the honor roll.

{¶ 65} In his closing argument at the hearing, father's counsel requested that the juvenile court not award permanent custody of the children to LCCS, but

instead grant an extension of time for father to successfully complete his treatment and reunite with the children. Father had been progressing in his treatment until he had been triggered by the anniversary of a traumatic event, and he had recently resumed treatment. The case still had nearly four months before the two-year mark, and father contended he could potentially be well enough to reunify with the children in that time. Further, father pointed out that although LCCS argued that permanency was in the children's best interests, LCCS had not yet identified a permanent placement.

{¶ 66} Alternatively, father argued in favor of granting legal custody to McIntosh, whom father alleged had no criminal history, was financially sound, and had an appropriate home. Father contended the children's best interests would be better served if the children were in the custody of McIntosh than if the they had to start over with an unknown person. Father also represented that there was no evidence that McIntosh had been in a relationship with father since December 2022.

{¶ 67} McIntosh presented similar arguments, providing some details about the stable home she could provide the children as well as her prior parenting experience. McIntosh argued that she was invested in the children, asserting that she had attended nearly every hearing and meeting in this case. McIntosh denied being in a relationship with father and said had not been for some time. She asserted that she would not allow father to be around the children if he were

20.

unstable, explaining she had never previously allowed him in her home when he was using.

{¶ 68} J.T. and R.T.'s attorney argued in favor of granting permanent custody to LCCS. In support, she stated that the children had told her that they were tired of being in this situation, they did not believe that father could be consistent and stable, and they feared if they were to be reunited with father that they would end up in foster care again. She pointed out that father had not been consistent with visiting the children or with his treatment.

{¶ 69} Further, the children's attorney echoed the concerns expressed by Beaudrie and Orr regarding McIntosh. She asserted that McIntosh did not have a long-term relationship with the children and had only known them for about three to four months, and she was concerned about the level of involvement McIntosh had in this case based on such a short relationship. The children's attorney also suggested McIntosh's failure to seek legal assistance was another mark against her.

{¶ 70} The juvenile court took the matter under advisement.

{¶ 71} Following the permanent custody hearing, the juvenile court entered its judgment terminating father's parental rights and awarding permanent custody of the children to LCCS. As to father, the court found by clear and convincing evidence that the children cannot be placed with him within a reasonable time or should not be placed with him. Specifically, it found under R.C. 2151.414(E)(1) that notwithstanding reasonable case planning and diligent efforts by LCCS, father

21.

failed continuously and repeatedly to substantially remedy the conditions that caused the children to be placed outside of the family home. The court determined that although father was in substantial compliance with his case plan for a period of time, he was no longer in compliance. It noted that father stopped engaging in services for several months and that he was admitted to a psychiatric hospital for an attempted suicide and had been admitted to an inpatient treatment center during trial.

{¶ 72} The juvenile court also found under R.C. 2151.414(E)(2) that father suffers from such severe chemical dependency and chronic mental illness that he was unable to provide an adequate permanent home for the children at that time, and that it is highly unlikely that father will remedy his chemical dependency and chronic mental illness within one year from the trial date. In addition to the circumstances the court cited to support a finding under R.C. 2151.414(E)(1), the court noted that father failed to provide samples for drug screening, hindering LCCS from monitoring his sobriety and progress. The court recognized that father had many mental health, substance abuse, and trauma-related issues, but explained that the children did not have to wait indefinitely for him to address those issues.

{¶ 73} The juvenile court also found that granting legal custody to McIntosh was not in the children's best interest. First, neither McIntosh nor father made any argument to explain why McIntosh's relationship with the children should be preserved. McIntosh, who had known the children for five months before the children went into care nearly two years earlier, had not established the

22.

children were bonded to her or had asked to live with her. The court stated that McIntosh's actions in appearing uninvited at J.T.'s baseball game and joking with him to lie to his foster parents about her presence were inappropriate.

**{¶ 74}** Next, the juvenile court explained that McIntosh's relationship with father made her an unsuitable choice for custody of the children. Even if McIntosh and father were no longer romantically involved, McIntosh allowed father to live with her when he needed support throughout the case. The court expressed concern that McIntosh would continue to allow father to do so, exposing the children to father's struggles, which had a negative impact on the children. It also noted that McIntosh had the opportunity to admit evidence and call witnesses to support her motion, but she had only called Beaudrie, who opined against McIntosh having custody of the children.

**{¶ 75}** Accordingly, the juvenile court found under R.C. 2151.414(D)(1) that it was in the best interest of the children to award permanent custody to LCCS for adoptive placement and planning. The court noted that the children were bonded with their foster family and doing well, the children desired permanency and neither child wanted to live with father.

### III. Assignments of Error

**{¶ 76}** Father has timely appealed the judgment terminating his parental rights and now asserts three assignments of error for our review:

> 1. The trial court's finding that father did not remedy the issue which caused the removal such that the children could not be

23.

placed with him within a reasonable time or should not be placed with him pursuant to R.C. 2151.414(E)(1) and (E)(2) was not supported by clear and convincing evidence when time remained on the case.

2. The trial court's finding that father demonstrated a lack of commitment to the children by failing to regularly support or visit them when able to do so, or otherwise demonstrating an unwillingness to provide an adequate permanent home for the children pursuant to R.C. 2151.414(E)(4) was not supported by clear and convincing evidence.

3. The court's denial of legal custody to Ms. McIntosh, a potential third party custodian, was not supported by clear and convincing evidence.

## IV. Analysis

### A. The juvenile court's decision terminating father's parental rights is not against the manifest weight of the evidence.

{¶ 77} Father's first and second assignments of error challenge the juvenile court's decision to terminate his parental rights.

"A trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence." *In re A.H.*, 6th Dist. Lucas No. L-11-1057, 2011-Ohio-4857, ¶ 11, citing *In re Andy-Jones*, 10th Dist. Franklin Nos. 03AP-1167, 03AP-1231, 2004-Ohio-3312, ¶ 28.

24.

"Reversal is proper only where its determined, after weighing the evidence and all reasonable inferences including the credibility of the witnesses, that the juvenile court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed." *In re S.S.*, 6th Dist. Lucas No. L-22-1219, 2023-Ohio-1663, ¶ 27, citing *In re T.J.*, 2021-Ohio-4085, 180 N.E.3d 706, ¶ 40 (6th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶ 78} The juvenile court, as the trier of fact, is in the best position to weigh the evidence and evaluate the testimony. *In re A.H.* at ¶ 11, citing *In re Brown*, 98 Ohio App.3d 337, 342, 648 N.E.2d 576 (3d Dist.1994). "Thus, in determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts." *In re S.S.* at ¶ 28, quoting *In re W.M.*, 6th Dist. Lucas No. L-22-1016, 2022-Ohio-1978, ¶ 42.

{¶ 79} To terminate parental rights and award permanent custody of a child to a public services agency under R.C. 2151.414, the juvenile court must find, by clear and convincing evidence, both of the following: (1) one of the enumerated factors in R.C. 2151.414(B)(1)(a)-(e) apply, and (2) permanent custody is in the best interests of the child. R.C. 2151.414(B)(1). To be clear and convincing, the evidence must be sufficient for the trier of fact to form a firm belief or conviction as to the facts sought to be established. *In re T.J.*, 2021-Ohio-4085, 180 N.E.3d 706, ¶ 36 (6th Dist.), citing *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. The clear and convincing standard

25.

requires more than a preponderance of the evidence, but it does not require proof beyond a reasonable doubt. *Cross* at paragraph three of the syllabus.

{¶ 80} In this case, father contests the juvenile court's finding that R.C. 2151.414(B)(1)(a) applies. He does not separately contest the court's determination that permanent custody to LCCS is in the best interest of the children.

R.C. 2151.414(B)(1)(a) provides that a trial court may grant permanent custody of a child to the agency if it finds that, in addition to the placement being in the best interest of the child,

> The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, * * * and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

R.C. 2151.414(E) requires a juvenile court to find that a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with either parent if any of sixteen factors are met.

Here, the juvenile court found that R.C. 2151.414(E)(1), (2), and (4) applied to father. R.C. 2151.414(E)(1) states,

> Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by

the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

R.C. 2151.414(E)(2) states,

Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code.

R.C. 2151.414(E)(4) states,

The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with

the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child. Notably, the juvenile court "only needed to find that one [R.C. 2151.414(E)] factor applied to support its holding." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 50; *In re Za.G.*, 6th Dist. Williams Nos. WM-19-019, WM-19-020, WM-19-021, WM-19-022, 2020-Ohio-405, ¶ 102.

**{¶ 81}** Father first contends that the juvenile court's finding under R.C. 2151.414(E)(1) that the children could not be placed with him within a reasonable time is not supported by clear and convincing evidence because father has made substantial progress with his substance abuse and mental health services. In support of this argument, father asserts that: (1) LCCS recognized father's success with dealing with his substance abuse issues; (2) he complied with case plan services; (3) he responded constructively to the relapse he went through around the first anniversary of being sexually assaulted; and (4) time remained on the case for father to demonstrate that custody could be returned to him.

**{¶ 82}** While father made some progress on his case plan services for a time, he experienced a significant relapse that lasted months, during which he resumed significant drug use, attempted suicide, and sought admittance to a mental health hospital in December 2022.

**{¶ 83}** After his discharge on January 10, 2023, father took a month to reestablish his mental health services. He was not compliant with his mental health treatment over the next two months, missing nearly half of his appointments

28.

with his therapist and psychiatrist. Ms. Saab considered the sessions he did attend to be "surface level," and his psychiatrist noted that father was evasive and avoidant, drug-seeking, and reported no substance abuse issues. Dr. White and Ms. Saab recommended more intensive treatment, including inpatient treatment, to father in March 2023. Father, however, did not act on their recommendation for two months, and he stopped attending formal therapy sessions altogether after his appointment with Ms. Saab on March 31, 2023. And when father did seek an admission to a psychiatric hospital (his third such hospitalization during the case's pendency), he chose to do so the day before the second hearing date on LCCS's motion for permanent custody. As a result, father lost the opportunity to testify at the hearing.

{¶ 84} As for Ms. Saab's testimony that father would potentially need only three to four months of treatment for his trauma to be well enough to reunify with his children, she expressly limited her opinion to father's treatment for trauma, not his substance abuse. She acknowledged that she was not qualified to give an opinion on the time necessary to treat an opioid addiction. She also testified that it was difficult for her to say how much treatment father still needed for trauma, clarifying that his mental health team "may have only scratched the surface."

{¶ 85} In addition to mental health issues, father also had substance abuse issues to address in his case plan. Throughout the 21-month history of the case, father had only about five months, from approximately May 2022 to September 2022, in which he dropped at a random drug screening and was not positive for

29.

any substance other than suboxone. Most recently, on his admission to the mental health hospital in December 2022, father tested positive for fentanyl and cocaine and admitted to using cocaine 20 out of the previous 30 days. Father did not provide drops to LCCS in February and March 2023, he has not been undergoing random screenings with his suboxone provider or through his probation, and he failed to appear for his scheduled screen with his suboxone provider at the end of March.

{¶ 86} Indeed, at the time of the hearing, father's substance abuse issues still required significant long-term treatment. Ms. Saab testified that after he was discharged from the hospital, father planned to seek residential substance abuse treatment. Beaudrie testified that residential treatment for opioid addiction is typically 30 days, which is then followed by intensive outpatient services for approximately 10 to 16 weeks, and then aftercare services for an additional 12 to 16 weeks. Beaudrie testified that only after the completion of all three forms of treatment would father have reached a point in his sobriety when he could be reunified with his children. Accordingly, even if all of father's substance-abuse treatment went as well as possible and father did not experience any additional relapses, father would not be ready to reunify with his children for at least six to nine months.

{¶ 87} Beyond the treatment father still required for his mental health and substance abuse issues, father also failed to establish he had independent housing as required by his case plan. The only person who testified during the hearing

30.

concerning father's current residence was Beaudrie, and she testified that she did not know where father was living because he was not in regular communication with her.

{¶ 88} Accordingly, the juvenile court's finding under R.C. 2151.414(E)(1) that father failed continuously and repeatedly to substantially remedy the conditions causing the children to be placed outside the children's home is not against the manifest weight of the evidence. As a result, the court's findings under R.C. 2151.414(E)(2) and (E)(4) need not be considered. *In re A.E.*, 6th Dist. Lucas No. L-23-1043, 2023-Ohio-2310, ¶ 68.

{¶ 89} Accordingly, father's first and second assignments of error are not well-taken.

### B. Father lacks standing to challenge the denial of McIntosh's motion for legal custody

{¶ 90} Next, father argues that because an adoptive home had not been identified for J.T. and R.T. at the time of the hearing, the juvenile court abused its discretion in denying McIntosh's motion for legal custody. However, "[a parent's] standing in [an appeal of a juvenile court's order terminating parental rights] is limited to challenging whether the court improperly terminated her parental rights. [The parent] has no standing to challenge whether the court erred in failing to grant custody of the child to a third party." *In re J.S.*, 6th Dist. Lucas No. L-14-1055, 2014-Ohio-3130, ¶ 25, citing *In re R.V.*, 6th Dist. Lucas Nos. L-10-1278, L-10-1301, 2011-Ohio-1837, ¶ 15-16. Father's standing is limited to

31.

challenging the juvenile court's termination of his parental rights, and therefore he does not have standing to challenge the juvenile court's denial of McIntosh's motion for legal custody. Accordingly, father's third assignment of error is not well-taken.

## V. Conclusion

{¶ 91} For the foregoing reasons, the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Father is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.


A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Thomas J. Osowik, J.                            _____
                                                    JUDGE

Christine E. Mayle, J.                         _____
                                                    JUDGE

Charles E. Sulek, J.                           _____
CONCUR.                                                     JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.

32.