**[Cite as *In re C.W.*, 2024-Ohio-2052.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re C.W., R.W.

Court of Appeals No.  L-23-1295

Trial Court No.  JC21286675

**DECISION AND JUDGMENT**

Decided:  May 28, 2024

* * * * *

David T. Rudebock, for appellee.

Autumn D. Adams, for appellant.

* * * * *

**ZMUDA, J.**

### I.  Introduction

**{¶ 1}** This matter is before the court on appeal from the judgment of the Lucas County Court of Common Pleas, Juvenile Division, granting permanent custody of C.W., (d.o.b. 12/15/14) and R.W., (d.o.b. 9/7/18) to Lucas County Children Services and terminating the parental rights of appellant-father, T.W.[1] Finding no error, we affirm.

---

[1] The juvenile court also entered judgment against mother and she did not appeal the judgment.

## II. Facts and Procedural Background

{¶ 2} In October of 2021, Lucas County Children Services (LCCS or the Agency) received a referral for dependency and neglect for C.W. and R.W., based on mother's drug use. Mother has a third child, A.M., who was placed in the legal custody of her father in 2022 and is not part of the case on appeal.

{¶ 3} After a shelter care hearing on October 24, 2021, C.W. and R.W. were placed in the agency's temporary custody. On December 20, 2021, the juvenile court held a hearing for adjudication and disposition. T.W. and mother consented to a finding of neglect and dependency and consented to the children remaining in their foster home placements, and the trial court determined it was in the best interest of the children to award temporary custody to LCCS.

{¶ 4} On October 25, 2022, the parties appeared for an annual review. The juvenile court addressed T.W.'s progress with his case plan, noting T.W. had completed a dual diagnostic assessment and was linked with Harbor for counseling but had not attended since April of 2022. T.W. reported his therapist passed away and he was awaiting assignment with a new therapist through Harbor. T.W. was also linked with Lutheran Social Services for domestic violence counseling and had completed four of the classes, with most courses consisting of 18 to 26 classes. T.W. was noted as consistent in attending weekly visitations with C.W. and R.W. and T.W. had employment and housing, but he was looking for a new home closer to work. At the conclusion of the hearing, the juvenile court extended temporary custody for LCCS, finding it was against the best interest of the children to return them to a parent's home.

2.

{¶ 5} On April 4, 2023, the parties appeared for a semi-annual review and hearing on LCCS's motion to extend temporary custody. LCCS noted that T.W. continued participating in services, including counseling, medication management, and domestic violence counseling. T.W. had not obtained independent housing and his roommate had not completed a background check. The juvenile court granted an extension of temporary custody, noting T.W. had made progress with his case plan services.

{¶ 6} On July 25, 2023, LCCS filed a motion for permanent custody of C.W. and R.W.

{¶ 7} On October 30, 2023, the matter proceeded to hearing on the motion for permanent custody. LCCS presented testimony of Linda Rosenbloom, an LCCS supervisor and K.M., the foster mother for C.W. and R.W.  T.W. testified on his own behalf and also presented testimony of J.W., his father. Finally, Robin Fuller, the guardian ad litem testified.

{¶ 8} Linda Rosenbloom testified on behalf of T.W.'s caseworker, who was on maternity leave at the time of trial. Rosenbloom testified that T.W. was offered case plan services and completed a dual diagnostic assessment and a domestic violence program, and continues with ongoing services. She testified that T.W. is consistent and regular in his visits with the children, although in July of 2023 T.W. used a two-hour, unsupervised visit to take the children to his grandfather's home. T.W.'s grandfather resides with T.W.'s brother, who is a registered sex offender.  Despite raising concerns with this visit, Rosenbloom testified that T.W. believed it was "no big deal" and planned on letting his grandfather help care for the children, should he obtain custody. Rosenbloom testified

3.

that T.W.'s lack of concern in placing the children in a home with a sex offender was an issue, stating, "It speaks to his ability to protect the children if he doesn't see there's a risk by being around a registered Tier 2 sex offender."

{¶ 9} Rosenbloom also visited T.W.'s current residence in the two weeks preceding trial. She testified T.W. lived in "an efficiency one-bedroom, a mattress on the ground." She stated:

> There was clothes all over. It had an unpleasant odor. It's—he's woefully unprepared to have children there. He doesn't have a refrigerator. I asked where it was. He said it's broken and he hasn't replaced it yet. I said, you know, where would your children be if you, you know, reunified? And he said, well, I could move to another apartment. But as of right now he is not prepared to have those children back.

{¶ 10} Rosenbloom testified regarding T.W.'s positive drug tests, including recent positive tests, indicating more than the occasional marijuana usage claimed by T.W. Rosenbloom also disputed T.W.'s claims of medical usage, based on T.W.'s disclosure that he smoked marijuana which she did not believe was the proper method for medical marijuana use. T.W.'s positive tests also demonstrated he used marijuana during the period in which his medical marijuana card had lapsed.

{¶ 11} Finally, Rosenbloom addressed concerns regarding T.W.'s stability. She noted T.W. has had at least five different addresses and numerous job changes, and while continuously employed, T.W. worked third shift and has no apparent plan for caring for C.W. and R.W. should the children get sick or need care before or after school. Rosenbloom also indicated the children expressed a desire to remain with their foster parents.

4.

{¶ 12} K.M. testified next. She testified she has been the foster mother for C.W. and R.W. for two years, and has had communication with T.W. during that time. K.M. testified that, about 6 to 7 months before trial, T.W. asked about a shared-parenting arrangement, indicating he felt there was a lot of financial responsibility involved in caring for the children.

{¶ 13} K.M. testified that the children like living with her and her husband, and indicated the children are integrated into life with their foster family and are especially close to K.M.'s step-daughter, who is 14. K.M. also testified that, while the children want to see their father, on a few occasions she picked them up early after one or the other child complained of not feeling well, but there was nothing wrong and the children indicated they just wanted to come home.

{¶ 14} Following K.M.'s testimony, the juvenile court admitted, without objection, the LCCS's exhibits: Exhibit 1, a certified copy of the LCCS records: Exhibit 2, the visitation logs; Exhibit 4, certified treatment records for T.W.; Exhibits 5 and 6, certified docket entries from Toledo Municipal Court and Lucas County Common Pleas Court with respect to T.W.'s domestic violence charge, bound over as a felony; Exhibits 7 and 11, certified records from Centralized Drug Testing for T.W.; Exhibit 8, a certified docket with respect to conviction for a sexually related offense and requirement to register as a sex offender for T.W.'s relative, B.W.; Exhibits 9 and 10, certified therapy records for the children; and Exhibit 13, certified records from Lutheran Social Services for T.W.

5.

{¶ 15} T.W.'s trial counsel then called J.W. as a witness. J.W. stated he is T.W.'s grandfather, great-grandfather to C.W. and R.W. J.W. testified he lives in Swanton with his other grandson, B.W., and a live-in girlfriend. J.W. acknowledged that B.W. is a registered sex offender, arising from a conviction in 2010.

{¶ 16} J.W. testified that T.W. and the children lived with him when the girls were younger, and C.W. was happy to see him. J.W. did not know R.W. as well, as she was a toddler when the children and T.W. moved out. J.W. testified the visit went well and B.W. remained in his bedroom the entire time. J.W. acknowledged, however, that T.W. never asked B.W. to leave prior to the visit and did not request that B.W. stay in his bedroom. J.W. also acknowledged that B.W.'s victim, relative to his conviction, was a minor.

{¶ 17} T.W. then testified, acknowledging he spoke to K.M. about a shared-parenting arrangement. He also admitted to yelling around the children, attributing it to his normal loud voice, because he is "tone deaf." However, T.W. denied yelling at his children. T.W. admitted to a domestic violence conviction, based on an incident while he lived with the mother of C.W. and R.W. While T.W. did not deny he had no contact with the children for a long period, from January 2021 until he was released from his 90-day jail sentence in February 2022, he attributed the lack of contact to a protection order obtained by the children's mother.[2]

---

[2] According to the record, T.W. was charged with a felony domestic violence offense, based on a previous domestic violence conviction in 2017, but entered a plea in the felony case to a misdemeanor offense in September 2021.

6.

{¶ 18} He also denied any substance abuse, while admitting to using marijuana. T.W. denied he was ever under the influence when he was with his children and testified that he would cease all marijuana use if he had custody of C.W. and R.W. T.W. indicated he had a stable, first-shift job, and had been working as a forklift operator in Findlay for 9 months. T.W. acknowledged his issues with housing but testified he intended to find suitable housing so the children could live with him.

{¶ 19} As to the visit at his grandfather's home, T.W. testified that he informed LCCS he was taking the children there and nobody objected. T.W. further testified that he notified his caseworker that his brother lived at the home and was a registered sex offender, and the only restrictions for the visit precluded T.W. from taking the children to his own home. T.W. testified that he does not believe his brother poses any risk to the children because his brother has children of his own.

{¶ 20} Finally, T.W. testified that it is in the children's best interests for him to remain in their lives as a father figure. T.W. also testified that the children view K.M. as their mother-figure, and he believed K.M. should also remain a presence in their life. Therefore, T.W. appeared to seek only partial custody despite being told that was not an option.

{¶ 21} Robin Fuller, the guardian ad litem, was the last to testify. Fuller conducted an independent investigation and prepared a report, filed with the juvenile court and admitted without objection as LCCS's Exhibit 12. Fuller testified that it was clear T.W. loved his children, but after two years, T.W. was still not in a position to provide C.W. and R.W. a safe and secure home. Fuller was also concerned regarding T.W.'s dismissal

7.

of the risk posed by his brother, B.W., a registered sex offender. Fuller indicated the children liked being with their father, but were happy with their foster family and wanted to stay there.

{¶ 22} As to the best interests of the children, Fuller recommended permanent custody to LCCS. Fuller noted that T.W. did not modify his behaviors regarding his marijuana use, was unable to obtain stable housing in two years, and the children needed safety, stability, and permanency in their lives.

{¶ 23} On November 15, 2023, the juvenile court issued its judgment, granting the motion of LCCS for permanent custody of C.W. and R.W.

{¶ 24} Based on the testimony and evidence adduced at hearing, the juvenile court found that T.W. completed his mental health assessment and domestic violence counseling and remains in counseling. However, the juvenile court also found that T.W. admittedly smokes marijuana for pain management and had failed to visit with the children from January 2021 through February 2022, before making efforts to have parenting time during the pendency of the case. Furthermore, T.W. took his children to their grandfather's home on the one occasion he was granted an unsupervised visit, despite the fact T.W.'s brother lives with the grandfather and the brother is a registered sex offender. T.W. did not think there were issues in taking the children to the residence of a registered sex offender because the brother was family. As to T.W.'s own home, he had five different homes during the pendency of the case, and his current home lacked adequate space for children, was unkept, and lacked a working refrigerator.

8.

{¶ 25} The juvenile court further found that the children expressed a wish to remain with their foster parents, and the foster mother testified she would like to adopt the children.

{¶ 26} The juvenile court found that LCCS presented clear and convincing evidence demonstrating that one or more of the conditions in R.C. 2151.414(B)(1)(a) though (e) applied and that a grant of permanent custody was in the best interest of C.W. and R.W.

{¶ 27} As to T.W., the juvenile court found that C.W. and R.W. cannot be placed with their parents within a reasonable time or should not be placed with their parents, pursuant to R.C. 2151.414(B)(1), that the children are abandoned in accordance with to R.C. 2151.414(B)(1)(b), and have been in LCCS temporary custody for 12 or more months of a consecutive 22-month period, in accordance with R.C. 2151.414(B)(1)(d). The juvenile court further determined that R.C. 2151.414(E)(4) and (10) applied, in that T.W. demonstrated a lack of commitment toward the children by failing to support, visit, or communicate with C.W. and R.W. when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the children; and that T.W. abandoned C.W. and R.W. by failing to visit or maintain contact for more than 90 days, regardless of any resumption of contact after that period of 90 days.

{¶ 28} The juvenile court found that a grant of permanent custody was in the best of interest of the children considering the children are doing well in their foster placement, both children expressed a desire to remain in their foster home, and the

9.

children's need for a legally secure, permanent placement cannot be achieved without a grant of permanent custody to LCCS.

{¶ 29} T.W. perfected a timely appeal of this judgment.

### III. Assignment of Error

{¶ 30} In challenging the judgment, T.W. asserts a single assignment of error, as follows:

> The finding of permanent custody being in the children's best interest was against the manifest weight of the evidence as Father had completed case plan services.

### IV. Analysis

{¶ 31} "[T]he right to raise one's children is an 'essential' and 'basic civil right.'" *In re Murray,* 52 Ohio St.3d 155, 157 (1990), quoting *Stanley v. Illinois,* 405 U.S. 645, 651 (1972) (additional citation omitted). Thus, suitable parents "have a 'paramount' right to the custody of their minor children." *Id.,* citing *In re Perales,* 52 Ohio St.2d 89, 97 (1977) (additional citation omitted). However, these rights are not absolute, as "[t]he constitutional right to raise one's children does not include a right to abuse, exploit, or neglect them, nor is there a right to permit others to do so." *In re K.H.,* 2008-Ohio-4825, ¶ 40, citing *In re D.A.,* 2007-Ohio-1105, ¶ 11.

{¶ 32} In reviewing the juvenile court's decision to terminate parental rights and award permanent custody to LCCS, we must determine whether the juvenile court's findings are supported by the manifest weight of the evidence. *In re Z.C.,* 2023-Ohio-4703, ¶ 1; *In re A.H.*, 2011-Ohio-4857, ¶ 11 (6th Dist.). "Reversal is proper only where

10.

[it is] determined, after weighing the evidence and all reasonable inferences including the credibility of the witnesses, that the juvenile court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed." *In re N.J.*, 2023-Ohio-3190, ¶ 38 (6th Dist.), citing *In re T.J.*, 2021-Ohio-4085, ¶ 40 (6th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

{¶ 33} In a review based on manifest weight, we recognize that the juvenile court is in the best position to weigh evidence and evaluate testimony, so "every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts." *In re A.E.*, 2023-Ohio-2310, ¶ 58 (6th Dist.), quoting *Eastley v. Volkman,* 2012-Ohio-2179, ¶ 21, quoting *Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80, fn. 3 (1984).

{¶ 34} "In Ohio, the termination of parental rights is governed by R.C. 2151.414." *In re K.H.* at ¶ 42. Before terminating parental rights and granting permanent custody to LCCS under R.C. 2151.414, the juvenile court must first find, by clear and convincing evidence, that (1) one of the enumerated factors under R.C. 2151.414(B)(1)(a)-(e) apply and (2) that permanent custody is in the best interest of the child. *In re A.H.* at ¶ 12, citing R.C. 2151.414(B)(1) and (2). "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford,* 161 Ohio St. 469 (1954), paragraph three of the syllabus.

11.

{¶ 35} In this case, T.W. challenges only the juvenile court's award of permanent custody, having consented to the findings of neglect and dependency. T.W. argues that a grant of permanent custody was against the manifest weight of the evidence because the evidence demonstrated T.W. completed his case plan services and remedied the issues that caused the children to be placed with the agency.

{¶ 36} A court may grant permanent custody of a child when it is in the best interests of the child, by clear and convincing evidence, and when one of the factors under R.C. 2151.414(B)(1) is found. The juvenile court determined that R.C. 2151.414(B)(1)(a) applied, and determined the children "cannot be placed with either parent within a reasonable time or should not be placed with either parent." The juvenile court further found that the children were abandoned, under R.C. 2151.414(B)(1)(b) and that the children had been in LCCS temporary custody for 12 or more months of a consecutive 22-month period, under R.C. 2151.414(B)(1)(d), and that the grant of permanent custody to LCCS was in the best interest of C.W. and R.W. under R.C. 2151.414(D).

{¶ 37} Because the juvenile court determined R.C. 2151.414(B)(1)(a) applied, it examined the factors under R.C. 2151.414(E). Only one factor is necessary to support a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re T.G.*, 2023-Ohio-2576, ¶ 38 (6th Dist.). Here, the juvenile court determined that the factors under (E)(4) and (10) applied.

12.

**{¶ 38}** As stated in R.C. 2151.414(E):

> …
> (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;
> …
> (10) The parent has abandoned the child.

**{¶ 39}** If the juvenile court determines any of the factors in R.C. 2151.414(E) applies, it must next determine whether an award of permanent custody to LCCS is in the best interest of the child, based on the factors in R.C. 2151.414(D)(1).

**{¶ 40}** T.W. challenges the "best interest" findings in this case, arguing it was in the children's best interest to be reunited with him because the evidence did not support the findings that he risked the children's safety by taking them to his grandfather's home, where a sex offender was present, and that his lack of housing resulted from a failure of LCCS to address housing expectations with T.W. He does not dispute the findings that the children spent 12 of 22 months in agency custody or that he went a year without any contact with C.W. and R.W., prior to engaging in case plan services.

**{¶ 41}** The "best interest" determination, under R.C. 2151.414(D), requires consideration of all relevant factors, "including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a

13.

consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

      (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

      (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

**{¶ 42}** Here, the juvenile court found C.W. and R.W. had been in foster care for nearly two years, were thriving in foster care, and stated a desire to remain with their foster family. The court noted the regular visits with T.W., but also noted the children made excuses to end visits early, and T.W. failed to have contact with C.W. and R.W. for over a year, from January 2021 until February 2022. Furthermore, LCCS was unable to identify an appropriate relative for placement, with T.W. making a vague assertion that he has relatives who would be able to assist him, with no specific names provided to enable the agency to investigate a relative for placement.

**{¶ 43}** The juvenile court determined the need for permanence could only be achieved through a grant of permanent custody to LCCS. In reaching this conclusion, the court noted the "case has run its course and is statutorily out of time" and T.W. demonstrated neither an ability to provide stability, considering his frequent change of address, nor his ability to provide security, considering his decision to take the children to a home where a registered sex offender was present.

**{¶ 44}** As to the factors under R.C. 2151.414(E), the juvenile court noted T.W.'s failure to have any contact with the children for over a year before engaging in case plan

14.

services. The court also found T.W. demonstrated an unwillingness to provide an adequate home or protect the children by his failure to obtain adequate housing and his poor decision to take C.W. and R.W. to a home where a registered sex offender resided.

{¶ 45} T.W. does not dispute any of the juvenile court's findings, focusing instead on his version of the facts. T.W. argues he remained vigilant while taking C.W. and R.W. to his grandfather's home, without addressing his earlier comments, denying his brother posed any risk to the children. T.W. also argues that his failure to obtain adequate housing was attributable to LCCS, who failed to communicate what was expected of T.W., and instead, "chastised [T.W.] for not having the style of home LCCS preferred." This argument lacks any support in the record, and implies LCCS had an obligation to secure appropriate housing for T.W., a claim wholly unsupported by any legal authority.

{¶ 46} In reviewing the record, we find clear and convincing evidence to support the juvenile court's finding. T.W.'s argument, moreover, does not challenge the evidence but, instead, attacks the juvenile court's conclusions, based on that evidence. T.W., furthermore, argues specific factors he believes are favorable to his case, without addressing the entire record that clearly and convincing supports the judgment of the juvenile court. Accordingly, we find T.W.'s sole assignment of error without merit.

{¶ 47} Based on the foregoing, T.W.'s assignment of error is not well-taken.

## V. Conclusion

**{¶ 48}** Finding substantial justice has been done, we affirm the judgment of the Lucas County Court of Common Pleas, Juvenile Division, awarding permanent custody of C.W. and R.W. to LCCS. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Gene A. Zmuda, J.         _____
                                              JUDGE

Myron C. Duhart, J.      

                                        _____
Charles E. Sulek, J.                                   JUDGE
CONCUR.

                                        _____
                                              JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.